# ARIZONA *v.* MAURO

No. 85–2121.  Argued March 31, 1987—Decided May 4, 1987

POWELL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, and SCALIA, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and BLACK-MUN, JJ., joined, *post*, p. 530.

*Jack Roberts*, Assistant Attorney General of Arizona, argued the cause for petitioner. With him on the brief were *Robert K. Corbin*, Attorney General, *Georgia B. Ellexson*, Assistant Attorney General, *William J. Schafer III*, and *John Verkamp*.

*Kathleen Kelly Walsh* argued the cause and filed a brief for respondent.

JUSTICE POWELL delivered the opinion of the Court.

While respondent in this case was in police custody, he indicated that he did not wish to answer any questions until a lawyer was present. The issue presented is whether, in the circumstances of this case, officers interrogated respondent in violation of the Fifth and Fourteenth Amendments when they allowed him to speak with his wife in the presence of a police officer.

I

On November 23, 1982, the Flagstaff Police Department received a telephone call from a local K mart store. The caller stated that a man had entered the store claiming to have killed his son. When officers reached the store, respondent Mauro freely admitted that he had killed his son. He directed the officers to the child's body, and then was arrested and advised of his constitutional rights pursuant to

*Miranda* v. *Arizona*, 384 U. S. 436 (1966). The officers then took Mauro to the police station, where he was advised of his *Miranda* rights again. At that point, Mauro told the officers that he did not wish to make any more statements without having a lawyer present. All questioning then ceased. As no secure detention area was available, Mauro was held in the office of the police captain.

At the same time, one of the officers, Detective Manson, was questioning Mauro's wife in another room. After she finished speaking with Manson, Mrs. Mauro asked if she could speak to her husband. Manson was reluctant to allow the meeting, but after Mrs. Mauro insisted, he discussed the request with his supervisor, Sergeant Allen. Allen testified that he "saw no harm in it and suggested to [Manson] that if she really sincerely wanted to talk to him to go ahead and allow it." App. 74. Allen instructed Manson not to leave Mr. and Mrs. Mauro alone and suggested that Manson tape-record the conversation.

Manson then "told both Mr. and Mrs. Mauro that they could speak together only if an officer were present in the room to observe and hear what was going on." *Id.*, at 218 (findings of trial court). He brought Mrs. Mauro into the room and seated himself at a desk, placing a tape recorder in plain sight on the desk. He recorded their brief conversation, in which she expressed despair about their situation. During the conversation, Mauro told his wife not to answer questions until a lawyer was present.[1]

---

[1] The entire conversation proceeded as follows:

"MRS. MAURO: Please—please, I don't know what to do. We should have put David [the victim] in the hospital. Please—I don't know what we're going to do. We should have went for help—we should have went for help.

"[MR. MAURO]: You tried as best you could to stop it.

"MRS. MAURO: I—

"[MR. MAURO]: Shut up.

"MRS. MAURO: —taken him to a mental hospital or something. What'll we do?

Mauro's defense at trial was that he had been insane at the time of the crime. In rebuttal, the prosecution played the tape of the meeting between Mauro and his wife, arguing that it demonstrated that Mauro was sane on the day of the murder. Mauro sought suppression of the recording on the ground that it was a product of police interrogation in violation of his *Miranda* rights. The trial court refused to suppress the recording. First, it explained the basis of the officers' decision to allow Mrs. Mauro to meet with her husband in the presence of a policeman:

> "The police counseled [Mrs. Mauro] not to [speak with her husband], but she was adamant about that. They finally yielded to her insistent demands. The Police Station lacked a secure interview room. The police justifiably appeared *[sic]* for Mrs. Mauro's . . . safety, and they were also concerned about security, both in terms of whether Mr. and Mrs. Mauro might cook up a lie or

---

"[MR. MAURO]: Shut up.

"DET. MANSON: Do you know a reverend or a priest or someone you can talk to—take care of David?

"MRS. MAURO: No.

"[MR. MAURO]: Don't answer questions until you get rights of attorney before you find out whats *[sic]* going on. You tried to stop me as best you can. What are you going to do, kill me? You tried the best you can to stop me.

"MRS. MAURO: I don't—we don't—I don't have money.

"[MR. MAURO]: There's a public attorney.

"MRS. MAURO: I don't know.

"[MR. MAURO]: There's a public attorney. Why don't you just be quiet.

"MRS. MAURO: I don't have any money to bury him. I don't have any money. All I got is enough money for the rent for the children and that's it.

"DET. MANSON: Did you want to talk to your husband any more?

"MRS. MAURO: No, I can't talk to him.

"[MR. MAURO]: Then don't talk to me—get out.

"MRS. MAURO: I don't know what to do. O.K."

149 Ariz. 24, 30–31, 716 P. 2d 393, 399–400 (1986).

swap statements with each other that shouldn't have been allowed, and whether some escape attempt might have been made, or whether there might have been an attempt to smuggle in a weapon. They really had no idea what to expect along those lines." *Ibid.*

In light of these justifications, the trial court found "that this procedure was not a ruse, nor a subterfuge by the police. They did not create this situation [*i. e.*, allowing the meeting] as an indirect means of avoiding the dictates of Miranda." *Ibid.* Accordingly, the trial court admitted the evidence. Mauro was convicted of murder and child abuse, and sentenced to death.

The Arizona Supreme Court reversed. 149 Ariz. 24, 716 P. 2d 393 (1986). It found that by allowing Mauro to speak with his wife in the presence of a police officer, the detectives interrogated Mauro within the meaning of *Miranda.* This interrogation was impermissible, the court said, because Mauro previously had invoked the right to have counsel present before being questioned further. The court noted that both detectives had acknowledged in pretrial hearings that they knew it was "possible" that Mauro might make incriminating statements if he saw his wife.[2] The court relied

---

[2] The court relied on testimony of the officers at the hearing in the trial court on the suppression motion. Sergeant Allen testified as follows:

"Q. [C]ertainly when you sent an officer in there to listen to that conversation, you knew that it was possible that he might make incriminating statements?

"A. That's correct.

"Q. And obviously, you wanted to record that conversation so as to have a record of those incriminating statements.

"A. That's correct." *Id.*, at 30, 716 P. 2d, at 399.
Detective Manson's testimony was as follows:

"Q. [Detective Manson], certainly you were aware that during the conversation either [Mrs. Mauro] or my client may have given an incriminating statement?

"A. Yes.

"Q. And obviously one of the purposes of your tape recording the interview was to take down any such statements?

on our statement in *Rhode Island* v. *Innis*, 446 U. S. 291 (1980), that interrogation includes a "practice that the police should know is reasonably likely to evoke an incriminating response from a suspect," *id.*, at 301. The court then concluded that the officers' testimony demonstrated that there had been interrogation, because "[t]hey both knew that if the conversation took place, incriminating statements were likely to be made." 149 Ariz., at 31, 716 P. 2d, at 400. Therefore, it held that the tape recording was not properly admitted at Mauro's trial.

Arizona filed a petition for a writ of certiorari. Because the decision below appeared to misconstrue our decision in *Rhode Island* v. *Innis, supra,* we granted the petition, 479 U. S. 811 (1986). We now reverse.

## II

We begin by summarizing the relevant legal principles. The Fifth Amendment provides that no "person . . . shall be compelled in any criminal case to be a witness against himself."[3] In *Miranda* v. *Arizona*, 384 U. S. 436 (1966), the Court concluded that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.*, at 467. "Accordingly, the Court formulated the now-familiar 'procedural safeguards effective to secure the privilege against self-incrimination.'" *Colorado* v. *Spring*, 479 U. S. 564, 572 (1987) (quoting *Miranda* v. *Arizona, supra*, at 444). Among these is the rule that when an accused has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authori-

---

"A. Yes, sir." *Ibid.*

[3] In *Malloy* v. *Hogan*, 378 U. S. 1 (1964), the Court held that the Fourteenth Amendment requires observance of this privilege in state-court proceedings.

ties until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards* v. *Arizona,* 451 U. S. 477, 484–485 (1981).

One of the questions frequently presented in cases in this area is whether particular police conduct constitutes "interrogation." In *Miranda,* the Court suggested in one passage that "interrogation" referred only to actual "questioning initiated by law enforcement officers." 384 U. S., at 444. But this statement was clarified in *Rhode Island* v. *Innis, supra.* In that case, the Court reviewed the police practices that had evoked the *Miranda* Court's concern about the coerciveness of the "'interrogation environment.'" 446 U. S., at 299 (quoting *Miranda, supra,* at 457). The questioned practices included "the use of lineups in which a coached witness would pick the defendant as the perpetrator . . .[,] the so-called 'reverse line-up' in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime," and a variety of "psychological ploys, such as to 'posi[t]' 'the guilt of the subject,' to 'minimize the moral seriousness of the offense,' and 'to cast blame on the victim or on society.'" 446 U. S., at 299 (quoting *Miranda, supra,* at 450) (brackets by *Innis* Court). None of these techniques involves express questioning, and yet the Court found that any of them, coupled with the "interrogation environment," was likely to "'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." 466 U. S., at 399 (quoting *Miranda, supra,* at 457). Thus, the *Innis* Court concluded that the goals of the *Miranda* safeguards could be effectuated if those safeguards extended not only to express questioning, but also to "its functional equivalent." 446 U. S., at 301. The Court explained the phrase "functional equivalent" of interrogation as including "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an

incriminating response from the suspect." *Ibid.* (footnotes omitted). Finally, it noted that "[t]he latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Ibid.*

## III

We now turn to the case before us. The officers gave Mauro the warnings required by *Miranda.* Mauro indicated that he did not wish to be questioned further without a lawyer present. Mauro never waived his right to have a lawyer present. The sole issue, then, is whether the officers' subsequent actions rose to the level of interrogation—that is, in the language of *Innis,* whether they were the "functional equivalent" of police interrogation. We think it is clear under both *Miranda* and *Innis* that Mauro was not interrogated. The tape recording of the conversation between Mauro and his wife shows that Detective Manson asked Mauro no questions about the crime or his conduct.[4] Nor is it suggested—or supported by any evidence—that Sergeant Allen's decision to allow Mauro's wife to see him was the kind of psychological ploy that properly could be treated as the functional equivalent of interrogation.[5]

---

[4] In the course of the conversation, that apparently lasted only a few minutes, Manson made two statements, both apparently directed at Mauro's wife. See n. 1, *supra.*

[5] JUSTICE STEVENS suggests that the officers "employed a powerful psychological ploy." *Post,* at 531. He bases this statement on his reading of the record that the officers "failed to give respondent any advance warning that Mrs. Mauro was coming to talk to him, that a police officer would accompany her, or that their conversation would be recorded." *Ibid.* This reading is difficult to reconcile with the trial court's conclusion that the officers "told both Mr. and Mrs. Mauro that they could speak together only if an officer were present in the room to observe and hear what was going on." App. 218. This sentence seems to indicate that Mauro received advance warning. But accepting the facts as JUSTICE STEVENS states them, the opinion still makes it clear that Mauro was fully informed before the conversation began. Similarly, it may be that the officers did not give Mr. Mauro advance warning that they would record the conversa-

There is no evidence that the officers sent Mrs. Mauro in to see her husband for the purpose of eliciting incriminating statements. As the trial court found, the officers tried to discourage her from talking to her husband, but finally "yielded to her insistent demands," App. 218. Nor was Detective Manson's presence improper. His testimony, that the trial court found credible, indicated a number of legitimate reasons—not related to securing incriminating statements—for having a police officer present. See *supra*, at 523–524 (quoting App. 218). Finally, the weakness of Mauro's claim that he was interrogated is underscored by examining the situation from his perspective. Cf. *Rhode Island* v. *Innis*, 446 U. S., at 301 (suggesting that the suspect's perspective may be relevant in some cases in determining whether police actions constitute interrogation). We doubt that a suspect, told by officers that his wife will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way.

The Arizona Supreme Court was correct to note that there was a "possibility" that Mauro would incriminate himself while talking to his wife. It also emphasized that the officers were aware of that possibility when they agreed to allow the Mauros to talk to each other.[6] But the actions in this case

tion, but the trial court noted that "[t]he officer who was present produced a tape recorder and told the couple that their conversation would be recorded and put that tape recorder down on the desk in plain sight and taped their conversation, so they had knowledge that that was going on." *Ibid.* JUSTICE STEVENS also implies that respondent was forced against his will to talk to his wife. *Post*, at 531. But, as the trial court observed, "[t]he defendant, with knowledge that the police were listening, could have chosen not to speak to his wife. Instead, he chose to speak." App. 219. In short, the trial court's findings completely rebut the atmosphere of oppressive police conduct portrayed by the dissent.

[6] The dissent suggests that the Arizona Supreme Court found as a fact that the officers intended to interrogate Mauro and faults us for reversing this allegedly factual finding. With due respect, we disagree with this reading of the record. The Arizona Supreme Court did not conclude that the officers intended to interrogate Mauro. Rather it concluded that

were far less questionable than the "subtle compulsion" that we held *not* to be interrogation in *Innis*. See *id.*, at 303. Officers do not interrogate a suspect simply by hoping that he will incriminate himself. In *Miranda*, and again in *Innis*, the Court emphasized:

> "Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda* v. *Arizona*, 384 U. S., at 478, quoted in *Rhode Island* v. *Innis*, *supra*, at 299–300.

See *Oregon* v. *Elstad*, 470 U. S. 298, 305 (1985). ("'[F]ar from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable'" (quoting *United States* v. *Washington*, 431 U. S. 181, 187 (1977))). Mauro was not subjected to compelling influences, psychological ploys, or direct questioning. Thus, his volunteered statements cannot properly be considered the result of police interrogation.

In deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in *Miranda* and *Edwards:* preventing government officials from

---

"[t]hey both knew that . . . incriminating statements were likely to be made." 149 Ariz., at 31, 716 P. 2d, at 400. Taken in context, this is a determination that the facts known to the officers satisfied the legal standard we established in *Rhode Island* v. *Innis*. Our decision today does not overturn any of the factual findings of the Arizona Supreme Court. Rather, it rests on a determination that the facts of this case do not present a sufficient likelihood of incrimination to satisfy the legal standard articulated in *Miranda* v. *Arizona* and in *Rhode Island* v. *Innis*.

using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment. The government actions in this case do not implicate this purpose in any way. Police departments need not adopt inflexible rules barring suspects from speaking with their spouses, nor must they ignore legitimate security concerns by allowing spouses to meet in private. In short, the officers in this case acted reasonably and lawfully by allowing Mrs. Mauro to speak with her husband. In this situation, the Federal Constitution does not forbid use of Mauro's subsequent statements at his criminal trial.

## IV

The judgment of the Arizona Supreme Court is reversed. The case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

The Supreme Court of Arizona unanimously and unequivocally concluded that the police intended to interrogate respondent.[1] This Court reverses, finding that no interroga-

---

[1] Thus, the Arizona Supreme Court credited part, but not all, of the following testimony by Detective Manson:

"Q. I'd like to ask you some questions concerning police interrogation techniques, if I might.

"Do you have any experience in police interrogation techniques?

"A. Yes, sir.

. . . . .

"Q. Another technique, Byron, would be to, for example, if you are investigating a juvenile matter, to have the parents come down and speak to the juvenile in your presence?

"A. That's correct.

"Q. Along those same lines, it's not uncommon to ask a family member to come in and speak to someone in your presence?

"A. That's correct.

"Q. And, in fact, that technique was utilized in this case, isn't it true?

tion occurred because Mauro "was not subjected to compelling influences, psychological ploys, or direct questioning." *Ante*, at 529. The record indicates, however, that the police employed a powerful psychological ploy; they failed to give respondent any advance warning that Mrs. Mauro was coming to talk to him, that a police officer would accompany her, or that their conversation would be recorded.[2] As the transcript of the conversation reveals, respondent would not have freely chosen to speak with her. See *ante*, at 522–523, n. 1. These facts compel the conclusion that the police took advantage of Mrs. Mauro's request to visit her husband, setting up a confrontation between them at a time when he manifestly desired to remain silent. Because they allowed respondent's conversation with his wife to commence at a time when they knew it was reasonably likely to produce an incriminating statement, the police interrogated him. The Court's opposite conclusion removes an important brick from the wall of

---

"A. I don't believe so, no, sir. That was not our purpose. That was not an interrogation method." App. 79, 81.

[2] The trial court found that the police "told both Mr. and Mrs. Mauro that they could speak together only if an officer were present in the room to observe what was going on." App. 218. This advice was not given to Mr. Mauro until Mrs. Mauro entered the room in which he was being held. The trial court did not dispute the testimony of Officer Manson, which establishes that up to the moment when Mrs. Mauro and Officer Manson entered the room with the tape recorder running, every effort was made to keep respondent from knowing that Mrs. Mauro was in the police station:

"Q. When did Mrs. Mauro become aware that her husband was in custody at the Police Station?

"A. I'm not sure. It was probably during our initial interview. I know that we had closed the door to the captain's office and that we entered through the back door. We didn't want them to see each other." *Id.*, at 111–112.

There is nothing in the trial court's opinion or elsewhere in the record to support the Court's apparent assumption, see *ante*, at 527–528, n. 5, that Officer Manson separately advised respondent beforehand that his wife would be brought in to see him and that a police officer would monitor the conversation.

protection against police overreaching that surrounds the Fifth Amendment rights of suspects in custody.

## I

At the time of the meeting in question between William Mauro and his wife, he was in police custody and had requested an attorney. It is therefore undisputed that he could not be subjected to interrogation until he either received the assistance of counsel or initiated a conversation with the police. See *ante*, at 525–526; *Edwards* v. *Arizona*, 451 U. S. 477, 484–485 (1981). Since neither event occurred, the tape-recorded evidence must be excluded if it was the product of "interrogation" within the meaning of *Rhode Island* v. *Innis*, 446 U. S. 291 (1980).

Police conduct may constitute "interrogation" even if the officers do not pose direct questions to the suspect. The Court explained the term in *Rhode Island* v. *Innis:*

> "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Id.*, at 301 (footnotes omitted).

In a footnote, the Court added:

> "By 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." *Id.*, at 301, n. 5 (emphasis in original).

The Arizona Supreme Court correctly applied the *Innis* standard when it held that "the admission of a tape-recorded conversation between [Mauro] and his wife violated his state and federal rights not to incriminate himself. U. S. Const. amend. V, XIV; Ariz. Const. art. 2, § 10." 149 Ariz. 24, 29,

716 P. 2d 393, 398 (1986).[3] After distinguishing the cases on which the Attorney General of Arizona relied,[4] the State Supreme Court explained:

> "Unlike the Narten cases and *Summerlin*, this is not a case where an officer accidentally overhears a conversation. Rather, here we have illicit custodial interrogation. At the time of the tape recording at issue, appellant was under arrest and being detained at a police station. There is no doubt that this constituted a custodial setting. However, besides being in a custodial setting, the conversation must constitute 'interrogation.'
>
> "Interrogation includes a 'practice that the police should know is reasonably likely to evoke an incriminating response from a suspect.' *Rhode Island* v. *Innis*, 446 U. S. 291, 301 . . . (1980). 'The focus in ascertaining whether particular police conduct amounts to interrogation, then, is not on the form of the words used, but the intent of the police officers and the perceptions of the

---

[3] The Arizona Supreme Court, after studying the trial record in light of our precedents, concluded that respondent's Fifth Amendment rights had been violated. Its decision rests on a careful evaluation of the behavior of the local police. Justices of that court regularly review cases in which Arizona police officers have testified. The Arizona Supreme Court's assessment of the actual intent of the Arizona police officers who testified in this case is therefore a good deal more reliable than this Court's. Indeed, whenever this Court reviews a state appellate court's examination of a trial record there is a special risk of error resulting from lack of familiarity with local conditions and from the limited time the Members of this Court can devote to study of the trial record. In some instances, this risk of error is outweighed by the necessity of granting review to decide an "issue of general or recurring significance" or to resolve a split of authority. *Connecticut* v. *Barrett*, 479 U. S. 523, 536 (1987) (STEVENS, J., dissenting). In my opinion, however, no trace of such necessity is present in this case. The vote of four Members of this Court to grant certiorari in this case was surely an exercise of indiscretion.

[4] *State* v. *Narten*, 99 Ariz. 116, 407 P. 2d 81 (1965), cert. denied, 384 U. S. 1008 (1966); *Narten* v. *Eyman*, 460 F. 2d 184 (CA9 1969); *State* v. *Summerlin*, 138 Ariz. 426, 675 P. 2d 686 (1984).

suspect.' *State* v. *Finehout*, 136 Ariz. at 230, 665 P. 2d at 574. An incriminating response is any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial. *Rhode Island* v. *Innis*, 446 U. S., at 301 n. 5 . . . .

"The intent of the detectives is clear from their own testimony. They both knew that if the conversation took place, incriminating statements were likely to be made. With that in mind, they decided to take in a tape recorder, sit near appellant and his wife and allow the conversation to commence.

"Since the intent of the detectives is so clear, we need not address appellant's perceptions. Whether the police knew that appellant was unusually disoriented or upset might have been an important factor in this case had the State's intent not been so unambiguous. *See id.*, 446 U. S. at 302–03 . . . (suspect's peculiar susceptibility to the police appeal and whether the police knew that appellant was unusually disoriented or upset are factors to be examined in determining the perceptions of a suspect). We find, therefore, that in allowing the conversation to commence, the police did indirectly what they could not do directly—interrogate appellant." *Id.*, at 31–32, 716 P. 2d, at 400–401.

## II

The Court's proffered reasons for disturbing these cogent findings are unpersuasive. In *Rhode Island* v. *Innis*, the Court emphasized that the police "cannot be held accountable for the unforeseeable results of their words or actions." 446 U. S., at 301–302. But there is a grand canyon between innocent unforeseeability and the mere lack of explicit police subterfuge that the Court now finds adequate to preclude a finding that an interrogation has taken place. It is, of course, true that the trial court found that the spousal conversation, which Detective Manson witnessed and recorded,

"was not a ruse, nor a subterfuge by the police. . . . They did not create this situation as an indirect means of avoiding the dictates of Miranda." App. 218. But this observation, as the Arizona Supreme Court correctly recognized, is not sufficient to satisfy the concerns of the Fifth Amendment.

It is undisputed that a police decision to place two suspects in the same room and then to listen to or record their conversation may constitute a form of interrogation even if no questions are asked by any police officers. That is exactly what happened here.[5] The police placed respondent and his wife, who was also in police custody, in the same small area. Mr. and Mrs. Mauro were both suspects in the murder of their son. Each of them had been interrogated separately before the officers decided to allow them to converse, an act that surely did not require a tape recorder or the presence of a police officer within hearing range. Under the circumstances, the police knew or should have known that Mrs. Mauro's encounter with respondent was reasonably likely to produce an incriminating response. Indeed, Officer Allen's supervisor testified that the police had a reasonable expectation that the spousal conversation would provide information on the murder investigation. When asked, "what was the purpose in having Detective Manson present during any interview or confrontation . . . between the defendant, Mr. Mauro, and his wife . . . ?" Captain Latham replied:

> "Well, one of the reasons would be to, for her protection, in case he attacked her or there was any violence that occurred. . . . The other reason would be to see what the conversation was about. *She and he both were under investigation at that time, and any statements that she made or he made could shed light on our case.*" App. 101 (emphasis added).

---

[5] The regrettable irony in this case is that respondent endured the functional equivalent of interrogation while in the very process of advising his wife to exercise her own Fifth Amendment right to remain silent. See *ante*, at 522–523, n. 1.

In my opinion, it was not only likely, but highly probable, that one of the suspects would make a statement that the prosecutor might seek to introduce at trial. It follows that the police conduct in this case was the "functional equivalent" of deliberate, direct interrogation.

The State should not be permitted to set aside this conclusion with testimony that merely indicates that the evidence-gathering purpose of the police was mixed with other motives. For example, it is irrelevant to the inquiry whether the police had legitimate security reasons for having an officer present that were "not related to securing incriminating statements." *Ante*, at 528. Nor does it matter that the officers lacked a precise expectation of how the statements Mauro would make might be incriminating; much interrogation is exploratory rather than directed at the admission of a fact whose incriminatory import is already known to the officers.

The Court's final proffered reason for disregarding the findings of the Supreme Court of Arizona is that the suspect may not have felt coerced to incriminate himself. The police did not compel or even encourage Mauro to speak with his wife. When they brought her into the room without warning Mauro in advance, however, they expected that the resulting conversation "could shed light on our case." App. 101. Under the circumstances, the mere fact that respondent's wife made the initial request leading to the conversation does not alter the correctness of the Supreme Court of Arizona's analysis. The officers exercised exclusive control over whether and when the suspects spoke with each other; the police knew that whatever Mauro might wish to convey to his wife at that moment, he would have to say under the conditions unilaterally imposed by the officers. In brief, the police exploited the custodial situation and the understandable desire of Mrs. Mauro to speak with respondent to conduct an interrogation.

I respectfully dissent.