**STATE of Maine**

v.

**Raymond A. SUMABAT.**

Supreme Judicial Court of Maine.

Argued Nov. 1, 1989.

Decided Nov. 30, 1989.

Peter J. Brann (orally), Rae Anne French, Asst. Attys. Gen., Augusta, for the State.

John D. Pelletier (orally), Goodspeed & O'Donnell, Augusta, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD, HORNBY and COLLINS, JJ.

McKUSICK, Chief Justice.

Just before midnight on December 1, 1987, a robbery took place at the Big Apple convenience store on State Street in Augusta. George Sprague, the employee on duty, was robbed and killed. Three days later Raymond A. Sumabat was arrested in Orlando, Florida, in connection with these crimes. On December 1, 1988, after a three-day jury trial in Superior Court (Waldo County, *Alexander, J.*), Sumabat was convicted of murder and armed robbery. On appeal Sumabat challenges the admis-

sion of statements he made to police in Florida following his arrest. He also challenges the heightened courtroom security measures in effect during his trial and the admission of certain other evidence. Sumabat fails, however, to establish any ground for us to disturb his convictions.

I.

*Statements Made in Florida*

■ Sumabat argues that the statements he made to the Orlando police following his arrest were the product of interrogation and improperly obtained. The court[1] denied Sumabat's motion to suppress, finding that the statements Sumabat made before he received his *Miranda* warnings were not the product of interrogation.

On the night of December 4, 1987, Detective Chisari of the Orlando police arrested Sumabat in Orlando for armed robbery pursuant to a warrant obtained by the Maine State Police. Chisari took Sumabat and his companion, Meredith Cain, to the police station. At the station Sumabat and Cain were separated and Chisari filled out the arrest affidavit in Sumabat's presence, asking Sumabat for information as necessary. Chisari then called Detective Reichtel of the Maine State Police. Reichtel asked Chisari to interview Cain and to attempt to interview Sumabat. Reichtel also told Chisari that someone had died during the robbery. When Chisari returned to the room, he asked Sumabat what his relationship was with Cain. Sumabat immediately told Chisari, "[s]he had nothing to do with the robbery. If she had known we were going to do a robbery, she would have tried to stop us. All we did was use her car." Chisari then read Sumabat his *Miranda* rights. Sumabat invoked his right to remain silent and Chisari acquiesced. When Chisari told Sumabat that he was going to talk to Cain, however, Sumabat repeated his statement that she had not been involved. After Sumabat himself spoke with Cain, he again told Chisari that she had nothing to do with the incident.

1. For the convenience of Florida witnesses, the suppression hearing took place during trial, with the same justice of the Superior Court presiding.

There is no clear error in the presiding justice's finding that Sumabat's statements regarding Cain were voluntary and not the product of interrogation. Interrogation in the *Miranda* sense includes express questioning by the police and "any equivalent indirect questioning or suggesting which the police should know is reasonably likely to elicit an incriminating response by the suspect." *State v. Philbrick*, 436 A.2d 844, 848 (Me.1981) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 299–300, 100 S.Ct. 1682, 1688–1689, 64 L.Ed.2d 297 (1980)). As the Court elaborated in Innis:

> Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influence is, of course, admissible in evidence. The fundamental import of the privilege [against self-incrimination] while an individual is in custody is not whether he is allowed to talk to the police without benefit of counsel, but whether he can be interrogated.... Volunteered statements of any kind are not barred by the Fifth Amendment.

*Id.* (quoting *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966)). After *Miranda* rights have been read and invoked and the police no longer ask express questions to investigate the incident, the issue on review of statements such as those made by Sumabat becomes "whether the officers' subsequent actions rose to the level of interrogation— that is, in the language of *Innis*, whether they were the functional equivalent of police interrogation." *Arizona v. Mauro*, 481 U.S. 520, 527, 107 S.Ct. 1931, 1935, 95 L.Ed.2d 458 (1987).

Contrary to Sumabat's contention, "interrogation" does not include everything except "routine booking" information. In *United States v. Downing*, 665 F.2d 404 (1st Cir.1981), on which Sumabat relies heavily, the court excluded evidence (keys to an airplane and evidence revealed by the keys) obtained by the police in a post-arrest search of a suspected drug smuggler, during which the police questioned the defendant about the keys after he had invoked his right to remain silent. The First Circuit, however, recognized the biographical data exception to the *Miranda* rule because of the need for police and other agencies to know the identity of people taken into custody. *Id.* at 406. This has been our rule for some time. *See State v. Estes*, 418 A.2d 1108, 1111 (Me.1980) ("Brief, routine questions posed to a suspect during 'booking' procedures ... do not constitute interrogation"); *State v. Simoneau*, 402 A.2d 870, 873 (Me.1979) (questions characterized by brevity, neutrality, and an absence of intent to elicit a confession or admission do not constitute interrogation). Rooted in *Innis* and subsequent decisions of the United States Supreme Court, this rule requires the trial court to examine the nature and motivation behind police questions and conduct for the threat of compulsion, the rationale behind the *Miranda* rule.

Chisari was seeking routine biographical information of no apparent testimonial value when he asked Sumabat about his relationship with Cain. Indeed, after Sumabat invoked his right to remain silent, Chisari did not ask him any questions or make any provocative statements regarding Cain. Sumabat's statements were gratuitous and in no way compelled by Chisari or by the circumstances of Sumabat's detention. The presiding justice properly found Sumabat's statements to be voluntary and not the product of interrogation in violation of his rights.

## II.

### Conduct of the Trial

Sumabat further objects to courtroom security measures taken at trial, to the testimony of the State's fingerprint expert, and to the admission in evidence of the victim's pants and belt. We find no abuse of discretion in the court's ruling on security and no reversible error in admission of the testimony and other evidence.

During Sumabat's trial two security officers dressed in civilian clothes were seated in the courtroom directly behind the defense. Although one of the officers was armed, the firearm was not readily noticeable. The court found this arrangement necessary because of Sumabat's previous

attempt to escape from jail, in which he had taken a hostage, and because of concerns that Sumabat might make another escape attempt with outside help. Sumabat does not challenge the court's finding that the increased security was necessary; instead, he argues that this unusual arrangement prejudiced the jury. Sumabat did not, however, request a curative instruction nor did he object to the instructions that were given at trial when he had the opportunity to do so. The increased security in this case was neither unduly prejudicial nor an abuse of the court's discretion. *See State v. Cormier*, 535 A.2d 913, 916 (Me.1987).

Sumabat next contends that the court should have declared a mistrial because the State's fingerprint expert, in response to cross-examination by the defense, testified that he received copies of Sumabat's fingerprints from North Carolina and Colorado. Sumabat argues that this testimony constituted evidence of Sumabat's prior criminal activity used in violation of M.R.Evid. 404(b) to prove Sumabat's conformity therewith in this case. This argument lacks merit. At most, this was a situation in which jurors might have inferred that Sumabat had some kind of criminal record in those other states. Since the defense itself elicited the response, then declined a curative instruction when the presiding justice offered to make one, there was no abuse of discretion in the presiding justice's refusal to grant a mistrial. *See State v. Lavoie*, 561 A.2d 1021, 1022 (Me.1989); *State v. Harnish*, 560 A.2d 5, 8 (Me.1989).

Sumabat finally contends that the presiding justice erred in admitting a pair of green pants and a belt, allegedly worn by the victim when he was killed; Sumabat argues that they were not sufficiently identified. In any event, Sumabat was not prejudiced from the admission of these items because their significance at trial lay only in the fact that a set of keys that usually hung from a clip on the victim's belt was missing. Sumabat did not object to the testimony of the medical examiner performing the autopsy and of the forensic lab technician that there were no keys at-

tached to the belt, nor did he object to Cain's testimony that Sumabat told her that he had taken those keys from the victim during the robbery and hidden them under a mattress at Sumabat's apartment. The admission of the physical evidence, if error, was harmless since Sumabat shows no prejudice whatever from its admission. *See State v. True*, 438 A.2d 460, 467 (Me. 1981).

The entry is:
Judgments affirmed.
All concurring.