**IN THE SUPREME COURT OF THE STATE OF IDAHO**
Docket No. 43643

|                          |     |                              |
| ------------------------ | --- | ---------------------------- |
| **STATE OF IDAHO,**      | )   |                              |
|                          | )   |                              |
| **Plaintiff-Appellant,** | )   | **Boise, April 2016 Term**   |
|                          | )   |                              |
| **v.**                   | )   | **2016 Opinion No. 66**      |
|                          | )   |                              |
| **JON STEVEN HUFFAKER,** | )   | **Filed:  June 23, 2016**    |
|                          | )   |                              |
| **Defendant-Respondent.**| )   | **Stephen W. Kenyon, Clerk** |
|                          | )   |                              |
|                          | )   |                              |

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Custer County. Hon, Alan C. Stephens, District Judge.

The order of the district court is <u>vacated</u> and this case is <u>remanded</u> for further action in accordance with this Opinion.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, attorney for appellant.  Kenneth K. Jorgensen argued.

Cannon Law, PA, Blackfoot, attorney for respondent. David M. Cannon argued.

_____

W. JONES, Justice

## I. NATURE OF THE CASE

This case comes to the Idaho Supreme Court on a petition for review of a Court of Appeals decision. At a hearing before the district court, Jon Steven Huffaker ("Huffaker") argued that both oral and written statements he had made to law enforcement were inadmissible because they were made in response to law enforcement questioning, while in law enforcement custody, and before he was informed of his Fifth Amendment rights as required under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The district court agreed, and entered an order suppressing the statements. On appeal by the State, the Court of Appeals affirmed the district court's order as to Huffaker's written statement, but reversed the order as to his oral statements. The Court of

1

Appeals reasoned that Huffaker was not in custody when his oral statements were made. The State petitioned this Court for review, which was granted.

On review before this Court, the State argues that the district court erred in suppressing Huffaker's statements because: (1) when Huffaker made his oral statements he was not in custody such that *Miranda* warnings were required; and (2) when Huffaker made his written statement he was not responding to interrogation such that *Miranda* warnings were required.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On July 12, 2014, around 5:00 A.M., Ben Savage ("Savage") appeared at the Custer County Sheriff's Office and reported that Huffaker had pointed a loaded rifle and threatened to kill him. At approximately 6:00 A.M. Sergeant Shawn Kramer ("Sgt. Kramer") of the Custer County Sheriff's Office located Huffaker walking his dog in a nearby field. Sgt. Kramer did not activate his lights or siren and did not hail or otherwise make contact with Huffaker. Huffaker noticed Sgt. Kramer's vehicle and approached it. Sgt. Kramer then informed Huffaker of Savage's allegations against him. At that time, Sgt. Kramer noticed that Huffaker appeared intoxicated. Sgt. Kramer offered to give Huffaker a ride to the Sheriff's Office so he could give Deputy Levi Maydole ("Deputy Maydole") his side of the story. Huffaker agreed, and Sgt. Kramer drove Huffaker and his dog to the Sheriff's Office. During the ride to the Sheriff's Office, Huffaker rode in the passenger seat of Sgt. Kramer's law enforcement vehicle while his dog rode in the back seat.

In the course of his interaction with Sgt. Kramer, Huffaker was not frisked or handcuffed. He was not physically or verbally coerced by Sgt. Kramer into entering the law enforcement vehicle. He was never told that he was being arrested, detained, or otherwise deprived of his freedom.

On arriving at the Sheriff's Office, Huffaker was taken to the "booking room." The booking room is located roughly seven feet from the lobby through a short hallway. Huffaker entered the booking room with Sgt. Kramer, who gestured to a chair next to the open door and said: "Go ahead and have a seat. Levi will come back and talk to you here in a minute alright man? You can let him know what's going on." Huffaker responded, "All right." Sgt. Kramer then gave Huffaker a thumbs up and left Huffaker alone in the interview room with the door open. After roughly one minute, Deputy Maydole entered the interview room. He was wearing a

2

full uniform and was armed. He asked, "Ok Jon, what happened this evening . . . or this morning?" He then sat down across from Huffaker, away from the door, which remained open.

Huffaker explained that he had been out at a local bar "drinking some beers and s*** last night" with Savage. At around 1:00 A.M. Savage had given Huffaker a ride home, at which point Huffaker told Savage that rather than drive home Savage should sleep in his truck, which was parked in front of Huffaker's camper. Before going to bed Huffaker brought Savage a couple of bottles of water. The next morning, when Huffaker approached Savage to wake him up, Savage "whopped me in the nose, which pissed me off because I had been drinking. . . I blew up. I went in and I got my rifle and I said 'you know how to operate one of these m******-f******.'"

Huffaker then told Maydole that he had asked Savage "where's your brass knuckles at? Why don't you go get them s**-of-a-b****** out?" At this point Deputy Maydole interrupted Huffaker to ask whether Savage was wearing the brass knuckles and then whether Huffaker had seen that Savage possessed a pair of brass knuckles. This was the first time that Deputy Maydole had spoken since asking what happened. Huffaker's response is indecipherable, but he clearly stated again that he had told Savage, "You know how to operate one of these m*****-f******" and that Savage had responded, "Oh I didn't mean it Jon, I didn't mean it." Huffaker then stated that "I had my gun out there I was going to shoot him."

Deputy Maydole next asked Huffaker why he pulled the gun on Savage. Huffaker responded, "Because he hit me. . . You want to hit me, I'll go back in and I'll mow you down." However, shortly thereafter when Deputy Maydole asked Huffaker if he was planning on killing Savage, Huffaker laughed. "No I wasn't planning on killing Ben." "So you just wanted to scare him?" Deputy Maydole asked. "Very much so." Huffaker replied.

After a roughly five minute interview, Deputy Maydole informed Huffaker that he was under arrest, to which Huffaker responded, "Oh really?" Huffaker then asked Deputy Maydole what the penalty is for Savage punching him. Deputy Maydole answered that "you can charge [Savage] if you want to for hitting you."

At approximately 9:00 A.M., roughly three hours after having been arrested, Huffaker requested and was provided with a "Voluntary Statement" form. The form prompts the party making the statement to: "[e]xplain what happened (who, what, where, when, why, times and places)." After initially ripping up the first form he was given, Huffaker requested a new form from Sgt. Kramer. Huffaker then wrote down an account of the events from that morning, which

3

contained incriminating statements similar to those he had made during his interview with Deputy Maydole.

At no point between making contact with Sgt. Kramer and filling out the voluntary statement form was Huffaker informed of his *Miranda* rights.

Prior to trial, the district court suppressed both Huffaker's interview and his written statement under *Miranda*. The district court reasoned that Huffaker was "in custody" during the interview because: (1) "Defendant has no way of returning home because he was intoxicated and Kramer had given him a ride to the station"; (2) "Defendant was questioned as the sole suspect by a law enforcement officer"; (3) "[h]e was not told he was free to leave"; and (4) "[a] normal person in Defendant's circumstances would not have believed they could end the interview and freely leave the police station."

Following entry of the order granting Huffaker's motion to suppress, the State appealed to the Court of Appeals. The Court of Appeals affirmed the order as to Huffaker's written statement, but reversed as to his oral statements, concluding that he was not in custody when those statements were made.

The State filed a petition for review to this Court, which was granted.

### III. ISSUES ON APPEAL

1.      Did the district court err in suppressing Huffaker's oral statements?
2.      Did the district court err in suppressing Huffaker's written statement?

### IV. STANDARD OF REVIEW

We review a district court's order granting a motion to suppress evidence using a bifurcated standard of review. *State v. Purdum*, 147 Idaho 206, 207, 207 P.3d 182, 183 (2009). This Court accepts the trial court's findings of fact unless they are clearly erroneous, but may freely review the trial court's application of constitutional principles in light of those facts. *Id.*

*State v. Wulff*, 157 Idaho 416, 418, 337 P.3d 575, 577 (2014).

### V. ANALYSIS

**A.      The district court erred in suppressing Huffaker's oral statements because Huffaker was not in custody when those statements were made.**

In *Miranda v. Arizona*, the U.S. Supreme Court was presented with four cases in which "[a] defendant was thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures." 384 U.S. 436, 457 (1996). The U.S. Supreme Court held that this practice was "at odds with one of our Nation's most cherished principles–that the individual may

4

not be compelled to incriminate himself." *Id.* at 457-58. Accordingly, in the *Miranda* decision, the U.S. Supreme Court established that:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

384 U.S. at 444. The purpose behind these safeguards is to "prevent[] government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Arizona v. Mauro*, 481 U.S. 520, 529–30 (1987); *see also State v. Bainbridge*, 108 Idaho 273, 298, 698 P.2d 335, 360 (1985).

As a practical matter, *Miranda* and its progeny establish that *Miranda* warnings are required where a suspect is in custody. *Id.* Custody is in turn determined by "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

The test to determine whether a defendant is in custody is objective. "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). In determining whether a suspect was in custody, "a court must examine all of the circumstances surrounding the interrogation." *Stansbury v. California*, 511 U.S. 318, 322 (1994). However, facts unknown to the suspect such as the intentions of law enforcement officers, are not relevant to a determination of custody. *See Berkemer*, 468 U.S. at 442. "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time." *Id.* at 442.

One factor in determining whether a defendant was in custody at the time of questioning is where the questioning occurred. *See Miranda* at 449–50. "In his office, the investigator possesses all of the advantages. The atmosphere suggests the invincibility of the forces of the law." *Id.* at 450. However, the fact that an interview takes place at a police station is not controlling for a custody analysis. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). In *Mathiason* the U.S. Supreme Court found that even though a defendant traveled to the police station and spoke with the police at their request, he was not in custody because "there is no indication that

5

the questioning took place in a context where respondent's freedom to depart was restricted." *Id.* In making this holding, the U.S. Supreme Court explained that:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place at the station house, or because the questioned person is one whom the police suspect.

*Id.* Likewise, in *Yarborough v. Alvarado*, the U.S. Supreme Court held that a suspect was not in custody, despite the fact that he was interviewed at the request of police, at a police station, and was never informed that he was free to leave. 541 U.S. 652, 665 (2004).

"The burden of showing custody rests on the defendant seeking to exclude evidence based on a failure to administer *Miranda* warnings." *State v. James*, 148 Idaho 574, 577, 225 P.3d 1169, 1172 (2010). In *James*, for example, this Court concluded that the defendant had failed to meet his burden where the only significant evidence presented in the defendant's favor was that a Sheriff's Deputy had threatened to legally arrest the occupants of a vehicle if no one admitted to possessing contraband that he had located. *Id.* at 578, 225 P.3d 1172.

In accordance with the precedent provided by this Court and the U.S. Supreme Court, we now hold that the district court erred in suppressing Huffaker's oral statements. The objective facts alleged by Huffaker before the district court are insufficient to meet his burden of proving that, given the totality of the circumstances, a reasonable person in Huffaker's position would have understood his or her freedom of movement to be restrained to the degree associated with a formal arrest. It follows, therefore, that it was error for the district court to conclude that Huffaker was in custody at the time of the interview such that *Miranda* warnings were required.

The district court based its conclusion that Huffaker had proved custody on the following findings of fact: (1) "Defendant had no way of returning home"; (2) "Defendant was questioned as the sole suspect by a law enforcement officer"; and (3) "[h]e was never told he was free to leave." It also noted in its recitation of facts that "[Sgt.] Kramer invited the defendant back to the police station to give his side of the story," and "Defendant was placed in an interview room." There do not appear to be any other facts addressed by the district court which could be construed in support of its conclusion.

First, we hold that the district court's finding that Huffaker "had no way of returning home" was clear error. The only evidence presented to the district court is that Huffaker lived, at most, a ten-minute walk from the Sheriff's Office. Barring exceptional circumstances, a ten-minute walk is not so onerous as to support the district court's findings. Huffaker was clearly not so intoxicated as to be unable to walk, as evidenced by the fact that he was walking his dog when he first made contact with Sgt. Kramer. Furthermore, even if Huffaker had not had a way of returning home, the fact that a party must procure his or her own transport from a law enforcement facility following an interview does not entail that he or she was in custody during that interview. The relevant question is whether a reasonable defendant would believe that his or her freedom of movement was restrained by the actions of law enforcement. It is not accurate to say that that person who is free to go but cannot arrange for their own transport would view their freedom of movement as restrained "by law enforcement."

Second, we hold that the district court's reliance on the fact that Huffaker was the only suspect at the time of the interview was also error. Whether or not law enforcement believed that Huffaker was the sole suspect or one of multiple suspects was a fact known only to law enforcement. It could not possibly have altered a reasonable person's perception of his or her circumstances. The holding of *Berkemer* bears repeating here: "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time." 468 U.S. at 442.

Considering the two errors made by the district court, we are left with three facts presented by Huffaker that conceivably weigh in favor of a finding of custody: (1) he was questioned at the Sheriff's Office; (2) at the request of the law enforcement; (3) and he was not explicitly instructed that he was free to leave. We hold that these facts are not sufficient to carry Huffaker's burden of proof. The U.S. Supreme Court was abundantly clear in *Mathiason* and *Yarborough*. The mere fact that an interview was conducted in a law enforcement facility, by an officer, at that officer's request, is not sufficient for a finding of custody. There must be some additional factual circumstances—some element of coercion or influence by law enforcement— which would cause a reasonable person to feel his or her freedom of movement was restrained.

Finally, Huffaker argues on appeal that he was uniquely susceptible to feeling that he was not free to leave because he was intoxicated at the time of the interview. However, whether Huffaker was intoxicated is irrelevant to a determination of custody. The test used by the U.S.

7

Supreme Court in determining custody is an objective test that takes into account how a reasonable person would view the totality of external circumstances. A reasonable person's viewpoint does not vary based upon factors affecting the internal, subjective, perception of the defendant. *See, e.g.*, *Yarborough*, 541 U.S. at 665–69. It stands to reason, therefore, that the fact that Huffaker was intoxicated does not affect a *Miranda* analysis.

**B.      The district court erred in suppressing Huffaker's written statement because that statement was not drafted in response to interrogation.**

The U.S. Supreme Court initially defined custodial interrogation as "questioning initiated by law enforcement officers." *Miranda*, 384 U.S. at 444. However, since *Miranda* the U.S. Supreme Court has expanded this definition to include not only express questioning but its "functional equivalent." *Arizona v. Mauro*, 481 U.S. 520, 526 (1987). The functional equivalent of questioning includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).

In contrast to incriminating responses to questioning or its functional equivalent, however:

> Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Miranda*, 384 U.S. at 478.

We hold that Huffaker's written statement should not have been suppressed by the district court because it was a statement "given freely and voluntarily without any compelling influences." The U.S. Supreme Court was very explicit in *Miranda* that its opinion was not intended to restrict the admissibility of volunteered statements. In order for *Miranda* protections to apply to a statement, it must be made in response to words or actions by law enforcement. Here there are two possible theories under which Huffaker's written statement could be viewed as a response to questioning. First, Huffaker's written statement might be viewed as a response to the earlier interview conducted by Deputy Maydole—this appears to have been the reasoning adopted by the district court, which concluded that it could not separate Huffaker's oral answers from his written statement for the purposes of a *Miranda* analysis. The second possibility is that

the action of providing the voluntary statement form to Huffaker in and of itself constituted an action that the police should have known would have elicited an incriminating response. Neither of these theories is persuasive.

First, there is no reason the district court should have had difficulty separating the oral statements and the written statement for the purposes of a *Miranda* analysis. There is no question that the interview itself constituted questioning (though as determined above, Huffaker was not in custody at the time); however, after the interview, Huffaker was placed in a holding cell. Huffaker did not make his written statement until roughly three hours had passed without any further questioning. Those three hours are more than enough to view the interrogation as having been terminated and it makes little sense to consider Huffaker's written statement to be a "continuation of the oral statements." In fact, the only evidence presented to the district court was that Huffaker made his written statement for the purposes of pressing charges against Savage. Huffaker's statement therefore was not in response to the earlier interview, but rather was undertaken of Huffaker's own accord in pursuit of related but separate charges.

Second, the action of giving Huffaker the voluntary statement form was not the functional equivalent of interrogation because the voluntary statement form was produced at Huffaker's request. Huffaker may argue that law enforcement should have known that he was going to incriminate himself in his voluntary statement. Even if true, however, the more fundamental problem is that Huffaker's written statement was not induced by law enforcement, but was made of Huffaker's own initiative.[1] Confessions are not protected by *Miranda* unless they are in response to interrogation. The fact that the form, which Huffaker requested from law enforcement, had a very general instruction on it to explain "who, what, when, where, why, times and places" does not make his confession any less unprompted.

In sum, there is no valid theory under which Huffaker's written statement was made in response to either interrogation or the functional equivalent of interrogation. Accordingly, we hold that it was error for the district court to suppress that statement.

---

[1] This would be a different case if law enforcement had proffered Huffaker the voluntary statement form and requested that he fill it out. In that instance, the questions on the form would likely constitute interrogation by law enforcement. However, in this case, Huffaker's statement was clearly volunteered and was not in response to the receipt of the form itself.

## VI. CONCLUSION

We hereby vacate the district court's order suppressing Huffaker's written and oral statements and remand for proceedings in accordance with this Opinion.

Chief Justice J. JONES and Justices EISMANN, BURDICK and HORTON CONCUR.