IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 18, 2021 Session

## STATE OF TENNESSEE v. JAMES MICHAEL MARTIN

**Appeal from the Criminal Court for Greene County**
**No. 18CR33     Alex E. Pearson, Judge**

---

### No. E2020-00097-CCA-R3-CD

---

The defendant, James Michael Martin, appeals his Greene County Criminal Court jury conviction of driving under the influence ("DUI"), arguing that the trial court erred by denying his motions to dismiss and suppress and that the evidence was insufficient to support his conviction.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Joseph O. McAfee, Greeneville, Tennessee, for the appellant, James Michael Martin.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Dan E. Armstrong, District Attorney General; and Cecil Mills, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Greene County Grand Jury charged the defendant with one count of DUI by driving a motor vehicle with a blood-alcohol concentration of .08 percent or more and one alternative count of DUI by driving a motor vehicle while under the influence of an intoxicant.

At the August 2019 trial, Eric Scott, an officer with the Greeneville City Police Department, testified that he responded to the scene of a vehicle crash at 1:30 a.m. on August 3, 2017.  He stated that it took him and Officer Chad Ricker "a few minutes to actually find where the vehicle had left the roadway" because it was "an area where there was a lot of undergrowth and it was a wooded area."  The vehicle had left the roadway and had "gone down into a ravine," which Officer Scott estimated to be approximately 30-feet

deep. The officers drove "back and forth on Kiser Boulevard" before locating the vehicle. Officer Scott said that they saw a broken utility pole and tire tracks "leading off into the wooded area." Officer Ricker went down the embankment to check on the occupants of the vehicle, while Officer Scott remained "at the top" of the ravine, waiting for other emergency responders to arrive and controlling traffic.

Officer Scott stated that Officer Ricker had "[k]nicked an artery on a broken tree limb as he was making his way into the ravine and that, after checking on the vehicle occupants, Officer Ricker "came back up" and received medical care. Officer Scott did not have contact with the defendant, who had been driving the vehicle, until approximately one-half-hour later when additional responders arrived and they "had some lighting" and "some folks that could go down there and retrieve him." Officer Scott stated that the defendant's "truck was kind of wedged in near another tree to where it was not easy for him to . . . get out of the vehicle, and so we had to wait for other help." After the defendant and his passenger were helped out of the vehicle, EMS personnel checked them for injuries; the defendant was not transported to the hospital.

Officer Scott noticed "the smell of alcohol" on the defendant and "some vomit on his shirt," which prompted Officer Scott to ask the defendant where he had been prior to the crash. The defendant told him that he had been at the Hyperion bar "for quite some time" and was driving to his girlfriend's house. Officer Scott said that the defendant told him that "a dog had run out in front of his vehicle, that he had swerved to try to avoid hitting that dog, and that caused him to go off the roadway." Officer Scott asked the defendant whether he had been drinking, and the defendant responded that "he'd had four or five beers." The defendant also told Officer Scott that he had taken prescription Oxycodone at 5:00 p.m. that evening. Officer Scott stated that the defendant appeared "somewhat unsteady on his feet," that his speech "was somewhat slurred," and that "[h]is eyes were somewhat glassy."

Officer Scott stated that he decided to administer field sobriety tests at that point and that the defendant denied having any physical or medical impairment that would affect his performance on the tests. Officer Scott said that he began with the "walk and turn test" in which he asked the defendant to take a series of steps along a line while counting aloud. He said that he administered the test "on a paved roadway in a fairly level area." Officer Scott testified that the defendant failed to take the correct number of steps, touch heel to toe, or walk a straight line. He said that, after the defendant took four steps, "he stopped and said, I can't do it. If I had a cane or could hold onto your arm, I think I could do it." At that point, Officer Scott stopped the test, noting that the defendant's performance was "poor." During the "one leg stand" test, the defendant held the position "for about four seconds and then put his foot down and he said I can't do it." Officer Scott noted the defendant's performance on that test as "poor."

Officer Scott said that he administered three additional field sobriety tests, explaining that because the defendant was 70 years old and because "he had just been involved in . . . a traffic crash," "I wanted to . . . give him any benefit that I could." Officer Scott rated the defendant's performance as "poor" on the finger-count test and the alphabet test because the defendant "wasn't following instructions." Finally, Officer Scott administered a "modified Romberg test" in which he asked the defendant to "tilt his head back a little bit and close his eyes, and to estimate the passage of 30 seconds." The defendant "went for 37 seconds" and stated "that he felt like that he had probably stopped early," which indicated to Officer Scott that the defendant's "internal time clock was going slow." Officer Scott stated that, during his interactions with the defendant, the defendant "was very cooperative."

Officer Scott determined that the defendant "had been operating a vehicle while under the influence" and "took him into custody." He said that he read the Implied Consent Form to the defendant, and the defendant signed the form, consenting to a blood test. Officer Scott took the defendant to Takoma Hospital, where a nurse asked the defendant "a few questions about his health" and drew his blood at 3:25 a.m. Officer Scott said that he was present during the procedure and heard the defendant's responses to the nurse's questions, which, Officer Scott noted were "[p]retty much the same thing that he had told me, that he had taken his Oxycodone earlier in the day." The defendant also told the nurse that, in addition to the beers that he had consumed at the Hyperion bar, he had also had "a couple of beers when he was mowing the lawn" earlier in the day. Officer Scott stated that the Tennessee Bureau of Investigation ("TBI") laboratory tested the blood sample for the presence of alcohol but did not test for Oxycodone.

During cross-examination, Officer Scott testified that his DUI training was administered by the Governor's Highway Safety personnel, using the training manual developed by the National Highway Traffic Safety Administration. He acknowledged that the three stages of DUI investigation are: the vehicle-in-motion stage, the personal contact stage, and the pre-arrest screening stage. He further acknowledged that he did not observe, and no witness reported on, the defendant's driving. Officer Scott explained that the three stages of DUI investigation are not required and are "just part of detecting and . . . administering for DUI" and that he relied on the three stages only "[w]hen they're available."

Officer Scott acknowledged that he saw that the defendant had a "scratch . . . on his forehead" and "there was some blood." In Officer Scott's field notes, he described the defendant as "[b]loody, unsteady, vomit on self and truck, odor of alcohol." Officer Scott stated that the defendant was not aggressive, combative, or argumentative. Officer Scott stated that he spoke to and observed the demeanor of the defendant's passenger and

-3-

determined that "she was very intoxicated."

Officer Scott said that it was possible for a person who was not under the influence of any intoxicant to perform poorly on a field sobriety test but noted that "there's typically a reason" for the poor performance. He explained that the DUI training he received taught that "people over the age of 65 would have more difficulty in performing the tests." Officer Scott said that he knew that the defendant was 70 years old when he administered the field sobriety tests. He acknowledged that it appeared that the defendant paid attention when Officer Scott instructed him how to perform the tests. Officer Scott stated that he administered two standardized field sobriety tests, which he stated are routinely used in DUI investigations, followed by three non-standardized tests because of the defendant's age and "because he had just been in a traffic crash." He explained that the non-standardized tests "are not physical in nature" and do not require the subject to walk or balance. He acknowledged that it could be possible for a sober person to perform poorly on the non-standardized tests but noted that it "would be very unusual."

Officer Scott acknowledged that he failed to note some details of his investigation in his report but said that he recalled the events of that day. He stated that, although he did not have a body camera at the time, he "believe[d] that there was a video that was taken from the patrol vehicle camera when we did the field sobriety" tests. He recalled that, after the defendant was treated by EMS, he positioned the defendant in front of his patrol vehicle so that the vehicle's camera would capture the defendant's performance on the field sobriety tests. Officer Scott stated that he believed that the camera in his patrol vehicle recorded the encounter but acknowledged that that video was no longer available.

On redirect examination, Officer Scott stated that he never viewed the dash camera video recording in this case. He also said that he was not certain that he in fact recorded the encounter and that he had no knowledge of any video having been destroyed. He explained that, at the time of the defendant's arrest, the Greeneville Police Department was "going through lots of changes that had to do with our . . . video, lots of technology changes." The recorded videos would be stored "for a certain period of time and if we didn't need it, then it automatically went off after a certain period of time." Officer Scott speculated that the video in this case "didn't get preserved" but acknowledged that he "couldn't tell you specifically."

Greeneville City Police Detective Michael Ottinger testified that the blood sample collected from the defendant was placed in the evidence locker on the day of the defendant's arrest and "hand delivered to the TBI Crime Lab in Knoxville" on August 24, 2017.

Leslie Greenier, a nurse at the Takoma Hospital emergency room, testified that she drew the defendant's blood on August 3, 2017, following a standard procedure. She said that when Officer Scott brought the defendant to the emergency room for a blood draw, she had the defendant sign a consent form, drew his blood, "label[ed] the tubes appropriately," put the tubes into a kit, and gave Officer Scott the closed kit.

TBI Special Agent Melanie Carlisle, a forensic scientist at the Knoxville Crime Laboratory, testified that she received two tubes containing the defendant's blood. She tested the blood samples for the presence of alcohol and determined a blood alcohol content of 0.147 gram percent of ethyl alcohol. She explained that she did not test for the presence of drugs because the laboratory's policy was to not perform further testing if the result of the alcohol test was "equal to or above the .085" standard. Agent Carlisle stated that because the legal standard for per se intoxication was .08, the laboratory set a standard of .085 to account for a margin of error.

During cross-examination, Agent Carlisle acknowledged that, when a defendant is convicted of DUI, the court assesses a $250 fee, which "will go into a general fund for the State of Tennessee," of which the TBI is a part. She stated, however, that the assessed fee "doesn't change my paycheck any and it doesn't change what the policy is going to say that we do as far as testing."

Chad Ricker, a deputy with the Unicoi County Sheriff's Office, testified that he worked for the Greeneville Police Department at the time of the defendant's arrest. He responded to the accident scene where he noticed "some power lines down." He said that the area where the vehicle had gone "down off the side of the road" had "thick vegetation" and a "steep drop off." He made his way down to the vehicle "to see if there was any injuries and how bad they were hurt." When he reached the vehicle, the man in the driver's seat and the woman in the passenger's seat told him that "they were okay." He said that he then noticed that "I was bleeding real bad from my arm where I cut it going down the ravine," stating that he had "cut that artery in my arm."

At the close of evidence, the jury convicted the defendant of count 1, DUI by driving a motor vehicle with a blood-alcohol concentration of .08 percent or more, but did not reach a verdict as to count 2.[1] After a sentencing hearing, the trial court sentenced the defendant to 11 months and 29 days with all but 10 days suspended to supervised probation and a fine of $350.

Following a timely but unsuccessful motion for new trial, the defendant filed

---

[1]    The jury submitted a question to the court during deliberations, asking, "'If we find guilty on Count Number 1, do we also have to vote on Count Number 2?'" With the agreement of the State, the court answered the jury's question in the negative.

a timely notice of appeal. In this appeal, the defendant argues that the trial court erred by denying his motions to dismiss and suppress and that the evidence was insufficient to support his conviction.

## I. Motion to Dismiss

The defendant argues that the charges against him should have been dismissed on the ground that the State failed to preserve a video recording of his performance on the field sobriety tests in violation of *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). The defendant further argues that this court should hold that law enforcement officers have "a duty to use, absent extraordinary circumstances, video recording devices when interacting with individuals who are under investigation or interrogation by law enforcement," arguing that the State's failure to capture every investigatory interaction violates a defendant's Fifth Amendment privilege against self-incrimination because, without video evidence, a defendant must testify if he wishes "to contest the facts as testified to by law enforcement." Finally, the defendant argues that the standard established in *State v. Merriman*, 410 S.W.3d 779, 791 (Tenn. 2013), is flawed as applied to his case because he had no opportunity to view the video footage and, consequently, cannot prove its exculpatory value.

At the motion hearing, the State conceded that, if Officer Scott's dash camera recorded the defendant's performance on the field sobriety tests, such footage no longer existed. The trial court found that the defendant had not shown bad faith on the part of the State in failing to retain video footage and that other evidence supported the allegations in the indictment. The court denied the motion to dismiss but determined to instruct the jury that they may draw an inference favorable to the defendant from the missing evidence.

In *State v. Ferguson*, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *State v. Ferguson*, 2 S.W.3d 912, 915-16 (Tenn. 1999)). Our supreme court observed that "the due process required under the Tennessee Constitution was broader than the due process required under the United States Constitution" and rejected the "bad faith" analysis espoused by the United States Supreme Court, *Merriman*, 410 S.W.3d at 784-85 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (holding "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law")), in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial," *Merriman*, 410 S.W.3d at 785. The supreme court also "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve

-6-

evidence." *Id.* at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

To facilitate this "balancing approach," our supreme court ruled that the trial court must first "determine whether the State had a duty to preserve the evidence," *Merriman*, 410 S.W.3d at 785, and observed that the State's duty to preserve was "limited to constitutionally material evidence," *id.* The court held that to be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Ferguson*, 2 S.W.3d at 915, 918). "If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." *Merriman*, 410 S.W.3d at 785 (citing *Ferguson*, 2 S.W.3d at 917). If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure:

"(1) [t]he degree of negligence involved;

(2) [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

(3) [t]he sufficiency of the other evidence used at trial to support the conviction."

*Merriman*, 410 S.W.3d at 785 (quoting *Ferguson*, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Merriman*, 410 S.W.3d at 785-86.

We review the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence under a de novo standard of review. *Id.* at 791 ("Because the application of *Ferguson* . . . presents a constitutional issue, we will apply a de novo standard of review to the trial court's decision concerning the fundamental fairness of the trial."). The trial court's choice of remedy, however, will not be overturned on appeal absent a showing that the trial court abused its discretion. *Id.* at 792 ("Thus, when the chosen remedy is consistent with the findings made by the trial court utilizing the *Ferguson* considerations, we will not overrule that choice on appeal.").

Here, the State did not violate *Ferguson* by failing to preserve video of Officer Scott's encounter with the defendant. The defendant was convicted of per se DUI by operating a vehicle with a blood alcohol content of .08 percent or more, which conviction was supported by the results of the defendant's blood test. The jury did not

-7-

reach a verdict on the alternative count of DUI by driving a motor vehicle while under the influence of an intoxicant. Because the defendant's behavior and performance during the field sobriety tests—even if contradictory to Officer Scott's testimony—has no bearing on the concentration of alcohol in his blood, video of the encounter would be wholly immaterial to the defendant's conviction. Consequently, the trial court did not err by denying the defendant's motion to dismiss for a *Ferguson* violation.

## II. Motion to Suppress

Next, the defendant argues that the trial court erred by denying his motion to suppress the statement he made at the hospital regarding the number of beers he consumed that day. The State contends that the trial court did not err.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette,* 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom,* 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom,* 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith,* 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan,* 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence" or police overreaching. *Bram v. United States,* 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly,* 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante,* 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond,* 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith,* 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson,* 878 S.W.2d 530, 545 (Tenn. 1994), *abrogated on other grounds by State v. Saylor*, 117 S.W.3d 239 (Tenn. 2003)); *see also State v. Thacker,* 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith,* 933 S.W.2d at 455-56 (quoting *Kelly,* 603 S.W.2d at 728 (internal citation and quotation marks omitted)).

Generally, custodial interrogation occurs when law enforcement officers initiate "questioning . . . after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Arizona v. Miranda*, 384 U.S. 436 (1966). Our supreme court has recognized that "a private third party's questioning of a person in police custody may perhaps constitute the functional equivalent of police interrogation if certain circumstances are present." *State v. Dotson*, 450 S.W.3d 1, 54 (Tenn. 2014) (citing *Arizona v. Mauro*, 481 U.S. 520, 526 (1987)). Such circumstances exist when, "for the purpose of eliciting incriminating statements," officers "asked, directed, induced, or threatened [the third party] to obtain information from the defendant." *Dotson*, 450 S.W.3d at 54 (citing *Mauro*, 481 U.S. at 528).

At the hearing on the motion to suppress, Officer Eric Scott testified much as he did at trial, stating that, while at the hospital, the nurse asked the defendant intake questions, including "what medications he takes and if he had been drinking." The defendant "told the nurse that he had also had a couple of beers earlier in the day while he was mowing the lawn," which statement Officer Scott overheard. Officer Scott said that he did not question the defendant at the hospital and did not instruct the nurse to do so. Officer Scott acknowledged that he did not provide the defendant with *Miranda* warnings.

During cross-examination, Officer Scott acknowledged that he asked Ms. Greenier to draw the defendant's blood as part of his investigation.

Here, the record lacks any evidence to indicate that Ms. Greenier's questioning the defendant about his alcohol consumption was at the behest of or on behalf of law enforcement. To be sure, the defendant was in custody at the time, and Ms. Greenier drew the defendant's blood at the request of Officer Scott; but, the defendant's response to Ms. Greenier's question was merely a statement made to a third party that was overheard by Officer Scott. *See Arizona v. Mauro*, 481 U.S. 520, 527 (1987) (concluding that the defendant's incriminating statements made to his wife while in police custody and in the

-9-

presence of an officer were not obtained in violation of the Fifth Amendment because the officers did not send the defendant's wife to him "for the purpose of eliciting incriminating statements"). Consequently, the trial court did not err by denying the defendant's motion to suppress.

## III. Sufficiency of the Evidence

Finally, the defendant contends that the State failed to present sufficient evidence to support his conviction of DUI, arguing, specifically, that the State failed to establish that the defendant's blood alcohol concentration was not the result of his having consumed alcohol during the time in which he waited to be extracted from the vehicle rather than his having consumed beers prior to driving.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (superseded on other grounds); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

As charged in this case, a person commits the offense of DUI if he drives or is "in physical control of any automobile . . . on any of the public roads and highways of the state" while "[t]he alcohol concentration in [his] . . . blood or breath is eight-hundredths of one percent (0.08%) or more." T.C.A. § 55-10-401(1).

The evidence adduced at trial, considered in the light most favorable to the State, established that the defendant, after consuming as many as seven beers, drove his pickup truck from the Hyperion bar with a blood alcohol concentration of 0.147 percent, running off the road, striking a utility pole, and coming to a stop at the bottom of a heavily-wooded, 30-foot ravine. The defendant argued to the jury that his blood alcohol concentration could have been the result of consumption of alcohol after the wreck while

the defendant waited for help to arrive, but the jury rejected that argument, as was their prerogative.  Consequently, this evidence sufficiently supports the defendant's conviction of DUI.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE