**Opinion filed February 3, 2022**



In The

# Eleventh Court of Appeals

_____

## No. 11-20-00037-CR

_____

## MICHAEL LEON GRUBB, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 104th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 22033B**

## M E M O R A N D U M   O P I N I O N

After the trial court denied his motion to suppress his confession and his motion for continuance, Appellant pleaded guilty to the offense of continuous sexual abuse of a young child. The jury sentenced Appellant to confinement for a term of forty years in the Institutional Division of the Texas Department of Criminal Justice. Appellant challenges his conviction in three issues. We affirm.

*Background Facts*

On June 4, 2019, PSEUPO made an outcry to her grandfather, J.O., that Appellant had been sexually abusing her. J.O. then took PSEUPO to the Law Enforcement Center (LEC) in Abilene. Prior to arriving at the LEC, J.O. made a call for service to the Abilene Police Department. Officer Kevin Pruitt responded to the call in the LEC parking lot around 7:30 p.m. Officer Pruitt immediately made contact with J.O., J.O.'s wife, and PSEUPO. Officer Pruitt spoke briefly with J.O. and PSEUPO before Appellant and his wife, Rebecca Grubb, arrived at the LEC.

J.O. informed Officer Pruitt that Appellant had arrived, and Officer Pruitt immediately requested assistance from other officers and went to intercept Appellant. Appellant informed Officer Pruitt that he was there to file a runaway report for his daughter, PSEUPO. Officer Pruitt informed Appellant that there were sexual assault allegations against him. Officer Matt Clopton responded to Officer Pruitt's request for assistance and stood with Appellant. Before Officer Pruitt returned to his conversation with J.O. and PSEUPO, Appellant handed his keys and other personal items to Officer Pruitt.[1]

Throughout much of his time with Appellant, Officer Clopton was unaware of the allegations made against Appellant. Officer Clopton spent around forty minutes standing with Appellant. During the first half of their time together, much of their conversation centered on things not involving the sexual abuse allegations. However, Appellant's wife, who had previously remained in the car, joined Officer Clopton's and Appellant's conversation. Appellant's wife asked Officer Clopton if she could have a private moment with Appellant, but Officer Clopton denied her request. Without any prompting from Officer Clopton, Appellant's wife began

---

[1]At Appellant's punishment trial, Officer Pruitt testified that he thought it was strange that Appellant personally surrendered his belongings.

asking Appellant if the allegations against him were true. In response to his wife's questions, Appellant admitted that PSEUPO and PSEUMM (Appellant's stepchild) were telling the truth and that he was guilty. However, Appellant maintained that he had only inappropriately touched the kids, and it only occurred when he was still drinking heavily.[2]

After making the admission to his wife, Appellant was taken inside the LEC, where Detective Frank Shoemaker interviewed him. Detective Shoemaker gave Appellant *Miranda*[3] warnings, and Appellant waived his rights. During this interview, Appellant made functionally the same admissions to Detective Shoemaker that he had previously made to his wife. Following the interview, the police arrested Appellant.

This case was originally set to go to trial in October 2019. However, on September 25, 2019, Appellant's counsel asked that the case be reset for a later date. The case was then set to occur on December 9, 2019. Again, Appellant's counsel requested the trial court to reset the case for a later date. Following this second reset, the case was set for January 6, 2020. On November 26, 2019, the trial court held a docket call, but Appellant's counsel was unable to attend. The trial court administrator testified that she sent Appellant's counsel's office a letter dated November 26, 2019, stating that the case was set for January 6 as the number one case on the jury trial docket for that date. However, Appellant's counsel claimed that his office never received that letter and maintained that he did not know of the number one status of the case for January 6 until shortly before the January 2 hearing

---

[2]Appellant's mother, Kathy Grubb, testified that prior to the events of June 4, 2019, Appellant was an alcoholic. However, around 2016, Appellant joined a small religious group that helped him overcome his addiction to alcohol. Appellant and his family remained heavily involved with this religious group from the time they joined it until police arrested Appellant. Following his departure from the religious group, Appellant reconnected with the mother of his only biological son, Sarah Baxter.

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966).

on Appellant's motion for continuance. The trial court denied Appellant's motion for continuance, and the case proceeded to trial on January 6, 2020.

Prior to jury selection, the trial court heard Appellant's motion to suppress his confession to Detective Shoemaker. The trial court denied the motion to suppress. The day after jury selection concluded, Appellant waived his right to have a jury decide his guilt and he pleaded guilty before the jury. Following Appellant's plea, the trial proceeded to punishment.

Appellant subsequently filed a motion for new trial. In the motion, Appellant asserted that "[d]ue to insufficient time to prepare, [he] was deprived of the ability to call witnesses on his behalf that would benefit his sentencing determination." The trial court denied the motion for new trial.

*Analysis*

*Motion to Suppress Confession*

In Appellant's first issue, he contends that the trial court erred by denying his motion to suppress his confession. Appellant asserts that his second statement to the police was tainted by the illegality of his first statement to the police, thus making neither statement admissible. Specifically, Appellant contends that his confession to his wife, which Officer Clopton recorded, was a custodial interrogation for which he was not given *Miranda* warnings.

Appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018) (citing *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016)); *see Guzman v. State*, 955 S.W.2d 85, 88–89 (Tex. Crim. App. 1997). At a hearing on a motion to suppress, the trial judge is the sole trier of fact and judge of the credibility of witnesses and the weight to be given to their testimony. *Lerma*, 543 S.W.3d at

4

190 (citing *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)). Therefore, we afford almost complete deference to the trial court in determining historical facts. *Id.* (citing *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000)). When the trial court makes no express findings of fact, appellate courts must review the evidence in the light most favorable to the trial court's ruling. *Carmouche*, 10 S.W.3d at 327–28.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The State may not use statements from "custodial interrogations of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Wilkerson v. State*, 173 S.W.3d 521, 526 (Tex. Crim. App. 2005) (citing *Miranda*, 384 U.S. at 444). The primary purpose of the *Miranda* rule is to guard "against coercive custodial questioning by police; it protects a suspect from the possibility of physical or psychological 'third degree' procedures." *Id.* at 527 (quoting *Cobb v. State*, 85 S.W.3d 258, 263 (Tex. Crim. App. 2002)). This rule, and the procedural warnings, are codified as Article 38.22 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 38.22 (West 2018).

Generally, the protections of *Miranda* are only triggered when the accused makes a statement while in custody and during a police interrogation. *See* George E. Dix & John M. Schmolesky, 41 *Texas Practice Series: Criminal Practice & Procedure* § 16:24 (3d ed.). Under *Miranda*, the custody analysis requires that courts consider "the circumstances surrounding the interrogation and whether a reasonable person in those circumstances would have felt that she was not free to leave." *Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2021) (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). Ultimately, our inquiry "is whether, under the circumstances, a reasonable person would have believed that her

freedom of movement was restricted to the degree associated with a formal arrest." *Wexler*, 625 S.W.3d at 167 (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996)).

Under *Miranda*, an interrogation is "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *State v. Cruz*, 461 S.W.3d 531, 536 (Tex. Crim. App. 2015) (alteration in original) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980)). When applying the test for whether an interrogation has occurred, the primary focus is on the perceptions of the suspect, rather than what the police intended. *Id.* at 536–37 (citing *Innis*, 446 U.S. at 301). However, "volunteered statements are not barred by *Miranda*, even when the accused is in custody." *Pugh v. State*, 624 S.W.3d 565, 568 (Tex. Crim. App. 2021) (citing *Arizona v. Mauro*, 481 U.S. 520, 529 (1987)).

We conclude that Officer Clopton's actions did not amount to a custodial interrogation of Appellant. Officer Clopton's involvement in this case began when Officer Pruitt asked him to supervise Appellant in the parking lot. Throughout much of the time Officer Clopton spent with Appellant, the two primarily discussed Appellant's line of work. However, Officer Clopton made it clear to Appellant that Appellant had more information than Officer Clopton did regarding the outcry.

After Officer Clopton and Appellant had been speaking for about thirty minutes, Appellant's wife asked if she could have a private moment with Appellant. Officer Clopton denied her request. Following this denial, Appellant's wife began asking Appellant if there was any validity to the victim's outcry, and Appellant admitted to her there was. After not allowing Appellant and his wife to have a private conversation, Officer Clopton stood idly by Appellant and never asked him any questions, nor did Officer Clopton force Appellant to respond to any of his wife's questions. "Private citizens ordinarily are not regarded as law enforcement

officers and thus cannot engage in custodial interrogation[.]" *Hailey v. State*, 413 S.W.3d 457, 474 (Tex. App.—Fort Worth 2012, pet. ref'd).

A case that is instructive to the outcome of this issue is *Arizona v. Mauro*. In *Mauro*, the police arrested the defendant and took him to the local police station. 481 U.S. at 522. Following his arrest, police gave the defendant his *Miranda* warnings, and he invoked his right to counsel. *Id.* The police held the defendant in the captain's office. *Id.* Sometime after the police secured the defendant in the captain's office, the defendant's wife arrived at the police station and demanded that she be allowed to speak with him. *Id.* The police granted her request to speak with her husband on the conditions that an officer be in the room with them and that the conversation be recorded. *Id.* While speaking to his wife, the defendant told his wife "not to answer questions until a lawyer was present." *Id.* The State then used this statement as evidence that the defendant was not insane at the time he committed his offense. *Id.* at 523.

The Supreme Court held that the defendant was not subject to a custodial interrogation during his conversation with his wife. *Id.* at 530. In reaching its conclusion, the Court focused on the following factors: the officer's decision to allow the defendant's wife to speak to him was not a psychological ploy; no evidence existed to show that officers sent the defendant's wife into the room with him with the purpose of eliciting any information; and when viewing the situation from the defendant's perspective, there was little chance that the defendant would feel that he was being coerced into making a confession. *Id.* at 527–28.

Appellant contends that *Mauro* is inapplicable to our facts because in *Mauro*, the defendant was given his *Miranda* rights and had invoked his rights before he made any statement. *Id.* at 522. However, we find this distinction immaterial to the question of whether a custodial interrogation occurred when Officer Clopton recorded Appellant speaking to his wife. As was the case in *Mauro,* there is no

evidence that the Abilene Police Department sent Appellant's wife to talk to him in order to circumvent the *Miranda* requirements. Additionally, when viewing the situation from Appellant's perspective, there is very little chance that he could feel coerced into incriminating himself because Officer Clopton was not asking him any questions regarding the outcry.

Appellant contends that Officer Clopton's act of keeping him and his wife together, within earshot of Officer Clopton's body camera, was a psychological ploy that ultimately amounted to an interrogation. Specifically, Appellant asserts that Officer Clopton's admission to his fellow officers that he kept Appellant with his wife hoping they would talk is evidence of a psychological ploy. In *Mauro*, however, the Court noted that "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself." *Id.* at 529; *see Escamilla v. State*, 143 S.W.3d 814, 822–24 (Tex. Crim. App. 2004) (custodial interrogation did not occur when reporter interviewed suspect even though police hoped suspect would confess during the interview). Additionally, the *Mauro* Court stated that "[p]olice departments need not adopt inflexible rules barring suspects from speaking with their spouses, nor must they ignore legitimate security concerns by allowing spouses to meet in private." *Id.* at 530. Here, because Officer Clopton did not ask Appellant any direct questions, after telling him and his wife that they could not speak in private, it is irrelevant that he told his fellow officers that he was hoping Appellant would say something incriminating. Further, Officer Clopton had legitimate safety reasons to keep Appellant and his wife together. This is because Appellant and the outcry victim were both still in the parking lot of the LEC when Officer Clopton began supervising him.

We conclude that neither Officer Clopton nor Appellant's wife conducted a custodial interrogation of Appellant when Appellant answered his wife's questions regarding the outcry. Therefore, we overrule Appellant's first issue.

8

*Motion for Continuance*

In Appellant's second issue, he asserts that the trial court erred by denying his motion for continuance. Appellant contends that the trial court provided his trial counsel with inadequate notice of the January 6, 2020 trial setting, and that as a result, he and his trial counsel had inadequate time to prepare for trial. Specifically, Appellant asserts that the trial court did not give his trial counsel adequate notice that his case was "set number one" for January 6. In this regard, there are at least two other instances in the clerk's record where Appellant's trial counsel was notified in writing that the case was set for trial on January 6: (1) a setting letter dated October 9, 2019 and (2) a docket call notification dated November 5, 2019. The trial court also issued a setting letter on November 26, 2019, stating that the case was "set #1" for January 6. Appellant's trial counsel asserts that he never received this letter.

We review a trial court's ruling on a motion for continuance for an abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007) (citing *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996)). A defendant must satisfy a two-prong test to show reversible error predicated on the denial of a pretrial motion for continuance. *See Gonzales v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010). First, the defendant must show that "the case made for delay was so convincing that no reasonable trial judge could conclude that scheduling and other considerations as well as fairness to the State outweighed the defendant's interest in delay of the trial." *Id.* (quoting George E. Dix & Robert O. Dawson, 42 *Texas Practice Series: Criminal Practice & Procedure* § 28.56 (2d ed. 2001)). Second, the defendant must show that he was actually prejudiced by the denial of his motion. *Id.*

In both his written motion for continuance and at the hearing on the motion, Appellant asserted that he and his trial counsel were unfairly surprised by the

January 6 setting that the case was number one, thus causing him prejudice.[4] In support of this assertion, Appellant claims that they never received the November 26 setting letter. However, at the hearing on the motion for continuance, the trial court's administrator testified that she called the office of Appellant's trial counsel in November and notified counsel's secretary of the January 6 setting. She further testified that she placed a notice letter in counsel's box at the courthouse on November 26 notifying him of the trial setting. Accordingly, the matter of timely notice to Appellant's trial counsel of the January 6 setting as the number one case was a disputed issue at the hearing. "Appellate courts view the evidence in the light most favorable to the trial court's ruling, defer to the court's credibility determinations, and presume that all reasonable fact findings in support of the ruling have been made." *State v. Thomas*, 428 S.W.3d 99, 104 (Tex. Crim. App. 2014) (addressing a motion for new trial).

Appellant essentially based his motion for continuance on the ground that he needed additional time for trial preparation. As noted by the court in *Gonzales*, a defendant filing a motion for continuance based upon a need for additional trial preparation must show diligence as a precondition to the motion. 304 S.W.3d at 843 (citing *Wright v. State*, 28 S.W.3d 526, 533 (Tex. Crim. App. 2000)). As noted by the court, "[a] request for delay to permit further investigation or other preparation for trial is based on nonstatutory and therefore equitable grounds. It is particularly within the discretion of the trial court." *Id.* at 844 n.11 (quoting Dix & Dawson, § 28.56).

The record before the trial court at the time of the hearing on the motion for new trial does not show diligence in trial preparation. The January 6 setting was the

---

[4]Appellant's trial counsel also indicated at the hearing on the motion for continuance that he was "still in the same position" because Appellant "hasn't fully paid me for trial."

third setting in the case. The case was originally set for October, and then December, before the January 6 setting. The case was reset on the two prior occasions at the request of Appellant's trial counsel. In addition to the November 26 setting letter, the trial court's setting letter dated October 9, 2019, and the docket notification dated November 5, 2019, notified Appellant's trial counsel that the case was set for trial on January 6. The trial court, when determining whether to grant a motion for continuance, may consider the history of the case with respect to previous continuances and a party's request to reset the trial setting. *See Rosales v. State*, 841 S.W.2d 368, 374 (Tex. Crim. App. 1992) (stating that "whether other continuances were . . . granted" is a factor relevant to the need for continuance in some contexts). The record does not show that the trial court abused its discretion by denying Appellant's motion for continuance based upon his claims of unfair surprise and the need for more time to prepare for trial. We overrule Appellant's second issue.

*Motion for New Trial*

In Appellant's third issue, he contends that the trial court erred by denying his motion for a new trial. Specifically, Appellant contends that he presented material and favorable evidence at his new-trial hearing that he would have presented at trial had his motion for continuance been granted. "We review a trial court's denial of a motion for new trial under an abuse of discretion standard." *McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex. Crim. App. 2012). We do not substitute our judgment for the trial court's judgment but, instead, determine whether the trial court's decision was arbitrary or unreasonable. *Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014). The trial court is the sole judge of a witness's credibility. *Id.* "Even if the testimony is not controverted or subject to cross-examination, the trial judge has discretion to disbelieve that testimony." *Id.* "We view the evidence in the light most favorable to the trial judge's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that

11

losing party." *Id.* When denying a motion for a new trial, a trial court abuses its discretion only if no reasonable view of the record could support the ruling. *Id.*

With one major exception, Appellant's motion for new trial was an extension of his motion for continuance. The exception concerned witness testimony that Appellant asserts he was deprived of using because the trial court did not grant his motion for continuance. He asserts on appeal that his motion for continuance was based on an absent witness. This assertion is incorrect because Appellant sought a continuance based upon his claims of unfair surprise and inadequate time for his trial counsel to prepare for trial.

When a motion for continuance is based upon an absent witness, a defendant must show that he has exercised diligence to procure the witness's attendance, that the witness is not absent by the procurement or consent of the defendant, and that the motion is not made for delay; he must also state the facts expected to be proved by the absent witness. CRIM. PROC. art. 29.06 (West 2006); *Harrison v. State*, 187 S.W.3d 429, 434 (Tex. Crim. App. 2005). It must appear to the trial court that the facts which are expected to be proved by the witness are material. CRIM. PROC. art. 29.06(3). Appellant's motion for continuance did not meet any of these requirements because Appellant did not identify the absent witnesses or the substance of their anticipated testimony. Appellant's motion merely stated that "[d]efendant . . . received insufficient notice of trial and cannot be ready for trial at the currently scheduled date, and counsel for defendant cannot render effective assistance of counsel."

Appellant's trial counsel testified at the hearing on the motion for new trial about the matters raised in the motion for continuance. He testified that his office "never received written notice of the number one setting in this case" for the January 6 setting. Appellant's trial counsel also testified that, if he had been provided more notice of the number one status of the case for the January 6 setting,

"there were a number of things that they planned to do" including having Appellant tested for the HPV virus to establish that he would have conceivably transmitted it to PSEUPO. He further testified that the short timeframe required him to make a number of judgment calls regarding the witnesses that would be called at trial. Counsel stated that he had insufficient time to interview witnesses and get subpoenas issued for them.

On cross-examination, Appellant's trial counsel testified that he had been representing Appellant for six months prior to the January 6 setting. Counsel acknowledged that he knew about the witnesses that he wanted to call for "several months prior to trial" but that he did not utilize the e-filing system to seek the issuance of subpoenas for them. Counsel also testified that he had access to an online docketing system that indicated the settings in the case. Thus, the testimony offered at the hearing on the motion for new trial supported the trial court's implicit determination of a lack of diligence in trial preparation. *See Gonzales*, 304 S.W.3d at 843.

Regardless of whether Appellant met his burden under the first prong of *Gonzales* to show diligence in preparing for trial, the record also does not establish that Appellant suffered prejudice by not having more time to prepare. Appellant's trial counsel was able to prepare a motion to suppress Appellant's confession for the trial court to consider. Trial counsel was also able to review the Child Advocacy Center's videos of the victims before trial. Additionally, Appellant's trial counsel was able to skillfully cross-examine each witness. Because Appellant's counsel was able to present his motion to suppress and was able to cross-examine each witness, Appellant was not prejudiced by the trial court's decision to deny his continuance motion for lack of additional preparation time.

Moreover, the record does not establish that the trial court abused its discretion by determining that Appellant was not prejudiced by not being able to call

13

the additional witnesses that he wanted to call. The first witness Appellant presented at his motion for new trial was Bill Roberson, Appellant's pastor. Appellant asserts that Roberson would have been a potential fact and character witness. During his testimony at the hearing on the motion for new trial, Roberson testified about Appellant's struggles with alcohol and how Appellant overcame his addiction. Roberson also testified that at the time of Appellant's punishment trial, there were two reasons why he would have hesitated to appear in court. First, Roberson did not want to swear under oath. Second, Roberson testified that he was hesitant to testify at trial because he "knew the ramification of what [Appellant] had been basically convicted of. [He] knew the damage, the other things that [Appellant] had caused." Additionally, Roberson testified to the importance of showing grace and that at first blush, forty years with no opportunity of parole seemed harsh to him. However, upon further questioning, Roberson stated that he could possibly consider the jury's sentence as reasonable if he had received all the information that the jury had at trial.

Furthermore, during Appellant's case-in-chief at punishment, Appellant's mother essentially provided the same relevant testimony that Roberson would have provided. She testified that Appellant had stopped drinking after joining Roberson's group. Accordingly, the testimony that Roberson might have provided at trial was not necessarily favorable to Appellant or material.

The next witness Appellant presented at his motion for a new trial was Sarah Baxter, the mother of Appellant's biological son. He contends that Baxter would have been a material fact and character witness for him. Appellant points to two aspects of Baxter's testimony that he contends makes her a material witness. First, Baxter testified that Appellant was "a good man" with a "good heart." She further testified that Appellant was "a helpful person" and "a good family man" who had made some bad choices. However, during cross-examination, Baxter testified as follows:

Q. I mean, you understand that was the evidence in the trial was, that along with several things, performing oral sex on his own biological daughter was one of the accusations?

A. I did not know that.

Q. What do you think about a man that performs oral sex on his biological daughter? Do you think that's a good family man?

A. I think there's some issues there that need to be addressed.

Q. Encourages and, in fact, teaches his biological daughter to perform oral sex on him.

A. Yeah. That's not right.

This testimony suggests that Baxter, as a character witness, was not fully informed of Appellant's character. Moreover, during Appellant's punishment trial, the jury heard essentially the same testimony from Appellant's mother to the effect that he was "a great dad."

The second aspect of Baxter's testimony that Appellant contends warranted a new trial on both guilt/innocence and punishment is that she is HPV positive. Appellant asserts that this aspect of Baxter's testimony is material because it would have "sown doubt as to whether PSEUPO's allegation of vaginal intercourse was true." During her testimony at the new trial hearing, Baxter testified as follows:

Q. All right. Let's move on to a different topic here for a minute. Do you have the HPV virus?

A. Yes, sir.

Q. All right. And do you believe that [Appellant] may have the HPV virus?

A. Yes, sir.

Appellant asserts that if his pretrial continuance would have been granted, he could have learned that Baxter had HPV before trial and gotten tested himself to further develop his theory. However, the State later elicited testimony from Appellant's trial counsel that he had no evidence to present at the new-trial hearing that Appellant

15

had HPV, or any STD for that matter.  Accordingly, the trial court could have reasonably concluded that Baxter's testimony would not have been material.

The third witness Appellant attempted to present at his new trial hearing was Justin Jackson, Appellant's coworker.  Jackson did not appear at Appellant's hearing despite having been issued a subpoena.  Appellant relied on a prior interview and his written motion for a new trial to establish what Jackson's testimony would have been.  Appellant contends that he established that Jackson would have testified as a character witness for him.  Appellant contends that Jackson would have testified that Appellant was a "straightforward, honest guy" who was also a very hard worker.  Additionally, Jackson would have testified that Appellant "didn't say foul things" and "never really participated in foul stuff because of his religious beliefs."  However, during Appellant's punishment trial, Appellant's mother offered functionally the same testimony that Jackson would have given:

> Q. . . . [W]hat personality traits would you highlight to the jury that have stood out to you about [Appellant] and who he is?
>
> A. Your willingness to stand by you regardless of what others may say about you or . . . or how it hurts, or how it would . . . distance him from . . . other people that he loved . . . and that he would stand beside you, made a commitment and would stay with you.  Growing up, he held himself accountable for . . . things that he had done. . . . [S]ince he was -- became sober, he's the one that if you called him . . . being an electrician, family members always called him, said, Hey, [Appellant], says, looking to do this.  Would you come help me?  He was there.  Helped them.  Uh, he had communication with a lot of my different family in that way, uh, more than I had.
>
> . . . .
>
> A. Very hard working.

The trial court did not abuse its discretion by its implicit determination that Jackson's testimony was not material.  We overrule Appellant's third issue.

16

*This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY

CHIEF JUSTICE


February 3, 2022

Do not publish.  *See* Tex. R. App. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.