

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-22-00763-CR

David **RODRIGUEZ** Jr.,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 437th Judicial District Court, Bexar County, Texas
Trial Court No. 2020CR10410
Honorable Melisa C. Skinner, Judge Presiding

Opinion by: Beth Watkins, Justice

Sitting: Patricia O. Alvarez, Justice
Irene Rios, Justice
Beth Watkins, Justice

Delivered and Filed: May 22, 2024

AFFIRMED

Appellant David Rodriguez Jr. appeals his manslaughter conviction. He argues the trial court erred in denying his motion to suppress and in admitting extraneous offense evidence. We affirm.

### BACKGROUND

The 9-1-1 call

Sara Medina called 9-1-1 to report that her seventeen-year-old son, Rodriguez, told her that he accidently shot his best friend Michael Prieto in the head. She gave the dispatcher Michael's

address on Sangria Road and said her son told her Michael was across the street from that address in a vacant house. She explained that Rodriguez was with her at their home on Oriole Court.

Sangria Road

When officers arrived at the vacant house on Sangria, they found Michael's body on the floor with a single gunshot wound to his head. Officers found a spent casing by his feet and a live cartridge about ten yards from his body.

Oriole Court

Bexar County Sheriff's Deputy Nogehelia Beltran arrived at the Rodriguez residence on Oriole Court around 9:00 p.m., and Medina let her in. Deputy Beltran entered Rodriguez's bedroom, handcuffed him, took him outside, patted him down, and placed him in her patrol car. The investigation on Oriole Court continued for several hours. Investigator Mark Waits spoke to Medina and Rodriguez's father, as well as officers at the house on Sangria. During that time, Rodriguez sat handcuffed in the patrol car. Eventually, officers transported Rodriguez to the police station for an interview. They also asked his parents to come to the station because "David Jr. may actually need a ride back home."

Police station—Rodriguez's visit with his father

At the station, officers left Rodriguez alone in an interview room for approximately 90 minutes. He was still handcuffed. At 1:11 a.m., his father entered the room with Investigator Waits and Detective Frank Stubbs. Investigator Waits explained to Rodriguez that they brought his father in to calm him down. Rodriguez's father faced his son and spoke directly to him, telling him that he loved him and that the officers "are here to help us." Detective Stubbs left the room. Rodriguez's father continued talking, encouraging his son to give a statement "to let them know what happened, exactly what happened, I mean, the way, the way it happened, okay." Rodriguez asked his father, "Can I just talk to the lawyer?" Investigator Waits responded, "Accidents happen, man, you know?

So." Rodriguez's father repeated that it "was an accident," and his son said, "I know." Rodriguez's father then told his son, "I already talked to the lawyer, the lawyer just said it's fine . . . let him know that what happened because it was an accident. You know what I'm saying." Rodriguez responded, "No." His father then explained that the officers know the boys are like brothers and they know the shooting was a mistake. Detective Stubbs reentered the room and Investigator Waits told Rodriguez's father, "Let us talk to him for a little bit." Rodriguez's father left the room, telling his son, "Let them know what they need to know, okay? Love you." Rodriguez's father was in the room for approximately two minutes.

Stationhouse—Rodriguez's Custodial Interrogation

At 1:13 a.m., Detective Stubbs read Rodriguez his *Miranda* rights, and Rodriguez gave a statement acknowledging that he accidentally shot Michael. He explained that Michael called an Uber to take Rodriguez from his house to the vacant house across the street from Michael's home. Rodriguez said he had been holding Michael's Smith & Wesson gun for him and intended to give it back. He thought he had unloaded the gun. Detective Stubbs said, "We know you racked a round out of it. Did you think it was unloaded at that point or did you pull the magazine out?" Rodriguez said he remembered thinking there was not a bullet in the gun. With his handcuffed hands, he motioned pulling back the slide. He said he did not remember if he took the magazine out but acknowledged that the magazine must have still been in there if, after he pulled the slide, there was still a bullet in the chamber. He described other actions before, during, and after the shooting and explained how he returned home. He also acknowledged that he used to have his own gun, but that the gun had been taken away from him.

At 1:46 a.m., the interview ended.

Indictment and Motion to Suppress

A grand jury indicted Rodriguez on a single manslaughter charge. He filed a motion to suppress his statement. At the motion to suppress hearing, he argued officers violated his rights under the Fourth and Fifth Amendments and article 38.22 of the Texas Code of Criminal Procedure. First, he argued his statement was the fruit of the poisonous tree obtained pursuant to a warrantless arrest for which the officers lacked probable cause. Second, he argued that the officers violated *Miranda* and article 38.22 when they took his statement after he clearly invoked the right to counsel and while his father acted as an agent for law enforcement. After hearing from Deputy Beltran, Investigator Waits, and Rodriguez's father, the trial court denied the motion.

Jury Trial and Sentence

At trial, the State argued the evidence would show that Rodriguez acted recklessly. *See* TEX. PENAL CODE ANN. § 6.03(c) ("A person acts recklessly . . . when he is aware of but consciously disregards a substantial and unjustifiable risk[.]"). Rodriguez argued the evidence would show that he shot Michael accidently and that, at most, he acted with criminal negligence. *Id*. at § 6.03(d) ("A person acts with criminal negligence . . . when he ought to be aware of a substantial and unjustifiable risk[.]").

The medical examiner testified that the bullet entered on the right side of Michael's head and exited the back of his head. He also testified that the entry wound characteristics—a tight dense cluster of powder tattooing without soot—suggested a close range of fire. The jury heard several law enforcement officers testify, listened to the 9-1-1 call, and watched the video of Rodriguez's custodial interrogation.

Sergeant Bruce Hallonquist testified about semi-automatic firearms, the crime scene, and firearm safety. He explained that to load the firearm, the user inserts the magazine containing the ammunition into the grip of the firearm and then racks the slide back to move a round of

ammunition into the firing chamber. To empty the firearm, the user drops the magazine from the grip and then racks the slide back to eject the live round. If the user fails to drop the magazine first, racking the slide back ejects the live round and picks up another, reloading the firearm. Sergeant Hallonquist identified the casing and bullet found at the crime scene as "an empty casing for a 40 caliber" and "a live round for a 40 caliber"—consistent for use with a semi-automatic firearm. He stated the first two rules of firearm safety as: "treat all weapons and/or firearms as if they're loaded at all times" and "never point [a firearm] at anything you're not willing to shoot."

To rebut the defense of accident Rodriguez raised during his opening statement—and over Rodriguez's objections—the trial court admitted a fourteen-second video of Rodriguez taking a loaded magazine in and out of the handle of a semi-automatic firearm and pointing the firearm at the camera. In closing, Rodriguez reiterated that at most he acted negligently; he was unaware that the firearm could still discharge after he racked the slide back. According to the State, the reckless act was not Rodriguez's belief that the firearm was unloaded or his inability to unload it, but his failure to follow the rules of firearm safety. The jury reviewed the charges of manslaughter and criminally negligent homicide and convicted Rodriguez of manslaughter. After a punishment hearing, the jury recommended the trial court sentence Rodriguez to ten years in prison, and the trial court did so. Rodriguez now appeals.

## ANALYSIS

### *Motion to Suppress*

On appeal, Rodriguez argues the trial court erred in denying the motion to suppress because his statement: (1) was involuntary under article 38.22 and the Fifth Amendment; (2) was the unattenuated fruit of an arrest in violation of the Fourth Amendment; and (3) was taken in violation of his Fifth Amendment right to counsel. He combines the first two arguments. "Questions of voluntariness and attenuation of taint are closely related; however, an attenuation analysis is

logically distinct from one involving only questions of voluntariness." *Flores v. State*, 172 S.W.3d 742, 748 n.4 (Tex. App.—Houston [14th Dist.] 2005, no pet.) "The voluntariness of the statement is a threshold requirement" to attenuation. *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975); *Martinez v. State*, 620 S.W.3d 734, 741 (Tex. Crim. App. 2021) ("A confession may be voluntary for Fifth Amendment purposes in that *Miranda* warnings were given and understood, but that is not sufficient to purge the taint of an illegal arrest."). We therefore address the three issues separately.

### Standard of Review

"In reviewing claims concerning *Miranda* violations and the admission of statements made as the result of custodial interrogation, we conduct the bifurcated review articulated in *Guzman v. State*." *Pecina v. State*, 361 S.W.3d 68, 78–79 (Tex. Crim. App. 2012). "We afford almost total deference to the trial court's rulings on questions of historical fact and on application of law to fact questions that turn upon credibility and demeanor while we review de novo the trial court's rulings on application of law to fact questions that do not turn upon credibility and demeanor." *Id*. at 79. The same standard applies when reviewing a trial court's attenuation of taint decision. *State v. Mazuca*, 375 S.W.3d 294, 307 (Tex. Crim. App. 2012). We uphold a trial court's motion to suppress ruling if it is correct on any theory of law that finds support in the record. *State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002).

### Involuntariness

Rodriguez contends Deputy Beltran unlawfully arrested him when she placed him in handcuffs "without probable cause" because she "had no information suggesting that the shooting was anything but an accidental one." Then, officers held him handcuffed in custody for more than four hours before reading his rights under *Miranda* and article 38.22. He argues his illegal arrest

constituted a coercive force that overcame his will, rendering involuntary his decision to waive those rights.

*Applicable Law*

"[A]n accused's custodial-interrogation statement is not admissible unless, prior to making the statement, he received the warnings provided in . . . article 38.22, § 2(a) . . . (which incorporate the requirements of *Miranda*), and he knowingly, intelligently, and voluntarily waived those rights." *Oursbourn v. State*, 259 S.W.3d 159, 171–72 (Tex. Crim. App. 2008); TEX. CODE CRIM. PROC. ANN. art. 38.22 § 2(a) & 3(a)(2). To evaluate whether a defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights, Texas appellate courts "turn to the standard outlined in *Moran v. Burbine*, 475 U.S. 412, 421 [] (1986)." *Joseph v. State*, 309 S.W.3d 20, 25 (Tex. Crim. App. 2010). "The inquiry has two distinct dimensions." *Moran*, 475 U.S. at 421. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id*.

*Application*

The trial court[1] found "no police misconduct and no coercion that made [Rodriguez's] statement involuntary" and "that [Rodriguez] was given his *Miranda* warnings, that he understood and waived his *Miranda* rights, and that his statement was freely and voluntarily given." We agree. First, as the trial court noted for the record, "whether [officers] believed they had probable cause

---

[1] Judge Joel Perez signed findings of fact and conclusions of law in which he noted that Judge Melisa Skinner presided over the trial and made her credibility findings clear on the record.

or not, they had probable cause." By the time Beltran arrived to detain Rodriguez, the circumstances indicated he was involved in the shooting death of another person.

Second, although officers held seventeen-year-old Rodriguez handcuffed in custody for more than four hours, he spent the first half of that time in a police car parked in front of his own house, while his parents talked to the officers. And at the end of the second half of that time, his father visited him at the police station and advised him to give a statement. Video recordings from both locations reveal that Rodriguez was alone for most of the time. The trial court found that Rodriguez was given the required warnings, that he understood his rights, and that he freely and voluntarily waived those rights when he gave his statement. The totality of the circumstances supports those findings and indicates that Rodriguez was aware of both the nature of the rights he was abandoning and the consequences of his decision to abandon them. *Joseph*, 309 S.W.3d at 25; *Moran*, 475 U.S. at 421. We therefore overrule Rodriguez's involuntary waiver argument. *See Brown*, 422 U.S. at 604; *Martinez*, 620 S.W.3d at 741.

*Fruit of Illegal Arrest*

Rodriguez next argues his statement was the result of an unlawful warrantless arrest and that the taint from the illegal arrest had not attenuated enough to allow the statement's admission.

*Applicable Law*

The fruit of the poisonous tree doctrine precludes the use of direct and indirect evidence obtained following an illegal arrest. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963). But not all evidence is "'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Id*. at 487–88. A legal break in the causal connection between the illegal conduct and the acquisition of the evidence will dissipate the taint. *Monge v. State*, 315 S.W.3d 35, 40–41 (Tex. Crim. App. 2010). "[E]vidence sufficiently attenuated from the violation of the law is not considered to be 'obtained'" from the violation. *Johnson v. State*, 871

S.W.2d 744, 750–51 (Tex. Crim. App. 1994). The State has the burden to prove attenuation. *Monge*, 315 S.W.3d at 40. In deciding attenuation, we consider the *Brown* factors: (1) whether *Miranda* warnings were given; (2) the time between the arrest and the confession; (3) the presence of any intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603–04.

*Application*

The trial court held that the *Miranda* warnings, the four-hour delay between the arrest and the statement, the intervening circumstance of the visit from Rodriguez's father, and the absence of official misconduct all weighed in favor of attenuation. The trial court's fact findings and conclusion are supported by the record.[2]

**Whether *Miranda* warnings were given**. "*Miranda* warnings are an important and necessary factor in determining whether the confession is obtained by exploitation of an illegal arrest." *Monge*, 315 S.W.3d at 40. Before Rodriguez made a statement, Detective Stubbs read Rodriguez his *Miranda* warnings, thus the first *Brown* factor weighs in favor of the State on attenuation. *Id*. at 40–41.

**The time between the arrest and the confession.** "If the time between an illegal arrest and a confession is short, it allows little time for attenuation of taint and indicates that there may be a causal connection between the illegal arrest and the confession." *Martinez*, 620 S.W.3d at 741. "The taint of the illegal arrest is more likely to be attenuated if the suspect has had time to rest, reflect, and eat; and time to consider options and exercise free will." *Id*. The Texas Court of

---

[2] At the motion to suppress hearing, the State briefly argued (as it does here) that the arrest was legal because there was probable cause Rodriguez had committed a felony, and the circumstances showed he was found in a suspicious place. TEX. CODE CRIM. PROC. art. 14.03(a)(1); *see Swain v. State*, 181 S.W.3d 359, 366 (Tex. Crim. App. 2005) ("Any 'place' may become suspicious when a person at that location and the accompanying circumstances raise a reasonable belief that the person has committed a crime and exigent circumstances call for immediate action or detention by police."). The trial court did not address this argument. We likewise decline to do so because we agree with the trial court's attenuation of taint finding.

Criminal Appeals has recognized, "if there is a short period of time (under three hours) between the illegal arrest and the confession, this factor will weigh in favor of [the defendant]." *Monge*, 315 S.W.3d at 40. Here, even though the timespan was four hours, the videos show that Rodriguez cried, dozed, prayed, and was offered water and coffee. We therefore consider this factor neutral.

**The presence of any intervening circumstances.** "Examples of significant intervening circumstances" that may break the causal connection between an illegal arrest and a confession "include the opportunity to meet with family[.]" *Martinez*, 620 S.W.3d at 741. The trial court held that the intervening circumstance of his father's visit weighed in favor of attenuation. It found credible Investigator Waits's testimony that he brought Rodriguez's father in to calm his son. Rodriguez's father testified that he agreed to Investigator Waits's request because he thought it would help his son. He recognized he had "the opportunity to say no." He testified that Investigator Waits "made it seem like we're going to go home" but made no promises to that effect. After viewing the stationhouse video, we agree with the trial court—Rodriguez's father is calm and comforting to his son. *See Bell v. State*, 724 S.W.2d 780, 791 (Tex. Crim. App. 1986) (considering visit with family a significant intervening circumstance). This factor favors the State.

**The purpose and flagrancy of official misconduct.** This "is one of the most important factors to be considered." *Monge*, 315 S.W.3d at 42 (internal quotation marks omitted). Arrests in the absence of probable cause, pretext arrests, unnecessarily intrusive arrests, and arrests for no apparent justification made with intent to extract a confession by exploitation may be "flagrantly abusive." *Id*. In this context, the failure to obtain an arrest warrant when probable cause exists is considered "a comparatively less serious misconduct." *Id*. Here, the record does not reflect flagrant abuse; rather, authorities failed to obtain a warrant in the face of probable cause. This factor likewise favors the State.

**Conclusion.** Three of the four *Brown* factors weigh in favor of the State. Weighing the factors together, we are satisfied that the confession in this case was sufficiently attenuated from the taint of any illegal arrest. *Id.* at 43.

### *Motion to Suppress-Invocation of Counsel*

Next, Rodriguez argues that when his father came inside the interrogation room with the officers, he acted as an agent of the officers. He contends that when he asked his father, "Can I just talk to a lawyer?" he invoked his right to counsel, and all questioning should have stopped.

### *Applicable Law*

*Miranda* applies whether the questioning is by law enforcement officers or their agents. *Wilkerson v. State*, 173 S.W.3d 521, 527 (Tex. Crim. App. 2005). And *Miranda* applies "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* "[O]nce a defendant in custody asks to speak with a lawyer, all interrogation must cease until a lawyer is present." *Id.* at 293.

### *Application*

The trial court found that Rodriguez's father did not interview his son; instead, "all his father did was, for the most part, talk at him." It noted that when Rodriguez said "can I just talk to the lawyer, to his father . . . his father says back to him, I already talked to the lawyer, he said it's fine, it was an accident, a mistake. That the victim was his best friend, that you were like brothers." "So that's -- that's -- he's not interrogating him at all. There's no real interview." The trial court

stated that "based on the credibility the witnesses," Rodriguez's father did not act as an agent of law enforcement because he "was not at the police station to accomplish the same purpose as the police" and did not act "in tandem" with police but rather "to provide comfort to" his son. We agree.

Courts determine whether a citizen acts as an agent of law enforcement by considering: "the relationship between the police and the potential police agent," "the record concerning the interviewer's actions and perceptions," and "the record for evidence of the defendant's perceptions of the encounter." *Wilkerson*, 173 S.W.3d at 530–31. Although Investigator Waits and Detective Stubbs knew that Rodriguez's father was going to speak with his son, arranged the meeting, and were present in the interview room, the father did not interview or question his son. *See id*. at 530 (questions informing the relationship between the police and the potential police agent). Rodriguez's father believed he would take his son home after police questioned him, and he did not act as a police agent by asking questions aimed at building a case. *See id.* (questions concerning the interviewer's actions and perceptions). There is no evidence that Rodriguez thought his father was a law-enforcement agent, nor that a reasonable person in his position would believe that his father was an agent. *Id*. at 530–31 (examining the record for evidence of the defendant's perceptions of the encounter).

Nor did Rodriguez's father subject his son to the functional equivalent of questioning. In *Arizona v. Mauro*, 481 U.S. 520 (1987), the Supreme Court addressed whether Mauro, who had already asserted his right to counsel, was subject to interrogation or its functional equivalent when police "allowed his wife to speak with him in the presence of a police officer." *Id*. at 521. The Supreme Court held Mauro was not. *Id*. at 530. Although officers knew Mauro might incriminate himself, the detective in the room "asked Mauro no questions about the crime or his conduct." *Id*. at 527. The "decision to allow Mauro's wife to see him was [not] the kind of psychological ploy

that properly could be treated as the functional equivalent of interrogation." *Id*. There was "no evidence that the officers sent Mrs. Mauro in to see her husband for the purpose of eliciting incriminating statements." *Id*. at 528. And, "examining the situation from his perspective," it is doubtful Mauro "would feel that he was being coerced to incriminate himself in any way." *Id*. Although, in contrast to this case, Mauro's wife made "insistent demands" to speak to her husband and the officers had tried to discourage her from talking to her husband, *see id*., the same lack of evidence is present here. "Officers do not interrogate a suspect simply by hoping that he will incriminate himself." *Id*.

Because Rodriguez's father did not act as an agent of law enforcement or subject his son to custodial interrogation or its functional equivalent at the time he asked about talking to an attorney, the question did not act as an effective invocation of his *Miranda* right to counsel. *Innis*, 446 U.S. at 299–300; *Illinois v. Perkins*, 496 U.S. 292, 297 (1990) ("It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation."). We therefore overrule Rodriguez's complaints about the trial court's denial of his motion to suppress.

### *Extraneous Offense*

In his final issue, Rodriguez argues the trial court erred in admitting the fourteen-second video of him handling a firearm, over his Rule 404(b) and 403 objections.

#### *Applicable Law and Standard of Review*

Extraneous offense evidence is admissible under both Rules 404(b) and 403 if: (1) it "is relevant to a fact of consequence in the case apart from its tendency to prove conduct in conformity with character"; and (2) its probative value is not "substantially outweighed by the danger of unfair prejudice," confusion of the issues, or misleading the jury. *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005); TEX. R. EVID. 404(b); TEX. R. EVID. 403. We review a trial court's decision to admit evidence for an abuse of discretion. *Martin*, 173 S.W.3d at 467. If the trial court's

ruling was within the zone of reasonable disagreement and correct on any theory of law applicable to the case, we are required to uphold it. *Dossett v. State*, 216 S.W.3d 7, 27 (Tex. App.—San Antonio 2006, pet. ref'd).

*Application*

The fourteen-second video depicts Rodriguez standing in front of a bathroom mirror and holding a firearm by his waist. He raises it, points it at the camera, removes its magazine, tilts the magazine towards the camera to show the live rounds inside it, re-inserts the magazine, and points it at the camera again—all the while appearing to sing and sway. As defense counsel put it, the video captured "a kid acting like a gang banger." The trial court found it admissible to rebut the defense of accident set out in Rodriguez's opening statement.

Rodriguez argues the evidence fails to rebut his defense of accident because "[s]omeone could know how to remove a clip from a firearm yet remain unaware that racking the slide chambers a live round, making the firearm deadly even if the clip is later removed." But "[u]nder Rule of Evidence 401, evidence is relevant if it has any tendency to make a 'fact . . . of consequence' more or less probable than it would be without the evidence." *Beham v. State*, 559 S.W.3d 474, 482 (Tex. Crim. App. 2018) (quoting TEX. R. EVID. 401). And evidence that Rodriguez had previously handled a semi-automatic firearm, in whatever manner, tends to make the defense of a lack of awareness less probable. The trial court did not abuse its discretion in finding the evidence relevant and admissible outside of character conformity. TEX. R. EVID. 401, 404(b)(2).

Nor did the trial court abuse its discretion in admitting the evidence over the Rule 403 objection. First, the evidence presented little danger of *unfair prejudice*. The jury had already heard Rodriguez admit that he possessed the firearm for a few days before he met Michael to return it. *See Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006) ("'[U]nfair prejudice,'

refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."). Second, the evidence did not tend to confuse the issues. It bore on a subject of a genuine controversy—Rodriguez's experience with firearms. *Id*. ("'[C]onfusion of the issues,' refers to a tendency to confuse or distract the jury from the main issues in the case."). Third, the evidence was not misleading. And the jury was well-equipped to judge the evidence's probative force given Sergeant Hallonquist's testimony about clearing semi-automatic firearms. *Id*. ("'[M]isleading the jury,' refers to a tendency of an item of evidence to be given undue weight . . . on other than emotional grounds."). Fourth, the evidence did not cause an undue delay or consume an inordinate about of time; the video was only fourteen seconds long and quickly authenticated. Finally, rather than a part of a needless presentation of cumulative evidence, it was the only evidence of its kind admitted at the guilt-innocence phase. The trial court could have reasonably concluded that the probative value of the short video was not substantially outweighed by the countervailing factors specified in the rule. *See id.* at 642–43. Therefore, we discern no abuse of discretion on the part of the trial court and overrule Rodriguez's evidentiary complaint.

## CONCLUSION

Having overruled Rodriguez's issues, we affirm the judgment of the trial court.

Beth Watkins, Justice

PUBLISH